BARATTI *v.* KOSER GIN COMPANY.

4-7240                                          177 S. W. 2d 750

Opinion delivered February 14, 1944.

*James C. Hale* and *John A. Fogleman,* for appellant.

*A. B. Shafer* and *Elton A. Rieves, Jr.,* for appellee.

Robins, J. Appellant brought suit in the circuit court against appellee, Koser Gin Company, asking judgment for $981 alleged to be due appellant on agreement for a rebate of $3 per bale on cotton ginned by appellee for appellant during the year 1942. Appellee, in its answer, denied generally all the allegations of the complaint, and set up as further defenses that the contract sued on was not properly authorized by the corporation and was fraud on the stockholders; that it was in violation of certain regulations of the federal price administrator, and that it was in violation of § 7 of Act 253 of the General Assembly of 1937 (§ 14317 of Pope's Digest of the laws of Arkansas) and therefore unenforceable. No defense, except the last one, is urged here.

Appellant testified that he was a stockholder in the Koser Gin Company, appellee, and that Mr. W. A. Koser was the managing officer; that during the time appellant had had his cotton ginned by appellee appellant had been regularly paid a rebate; that in the early part of 1942, Mr. Koser had agreed to pay him the sum of $3 to $3.50 per bale rebate on all cotton ginned out of the crop of 1942; that he knew of rebates being paid to various other farmers; that there was nothing secret about any of these arrangements for rebate; that appellant received a larger rebate than others on account of the fact that he brought more cotton to the gin than anyone else and also because he solicited business for the gin; that he had received a larger rebate than this from another cotton gin in that vicinity; that appellant had never received any dividend on stock owned by him in this gin; that he ginned 386 bales during the year 1942, and had

received on this rebate $177.53, leaving balance of $981 due. (The amount per bale charged by appellee for ginning was not shown in the testimony, but it appears that the ginning charge was taken out of the proceeds of the customer's cottonseed.)

R. S. McCarter testified that he lived in the vicinity of this gin, and that he received a rebate of $2 per bale on his cotton under an agreement with Mr. Koser; that Mr. Stockley received a rebate, and that he knew Mr. Finley was getting a rebate; that there was no secret about it, it was the custom.

E. J. White, president of the Bank of West Memphis, introduced in evidence a photostatic copy of a check dated March 26, 1942, for $734.35, issued by W. A. Koser, planter and ginner, to Mac Baratti. This check was afterwards identified by appellant as being a check given him for rebate on ginning charges on cotton raised during 1941.

E. Baioni testified that he was a farmer living near the Koser Gin Company, and that he received a rebate on his cotton paid to him in February, 1943; that the gin gave a rebate of $1 per bale to anyone who ginned there, and that there was no secret about it.

U. Stupenti testified that he was a farmer living near this gin and was paid a rebate of $1 per bale by Mrs. Koser after the death of W. A. Koser; that his brother had a like agreement, and that he heard that others did.

Isadore Banks testified that he was a farmer living in that vicinity, and that he received a rebate of $1 a bale for cotton ginned by him during 1942; that there was no secret about the agreement; that everyone knew about it.

Mrs. Madge Koser testified that she was formerly a stockholder and officer of the Koser Gin Company; that W. A. Koser was president; that no stockholder ever objected to the rebating contracts made by W. A. Koser.

Charles Stockley testified that he had ginned a few bales at the Koser gin under an oral agreement for re-

bate of $2 per bale and was paid this rebate by Koser who died before the institution of this suit; that there was no secret about this agreement; that he had heard about the rebating agreements with others.

At the conclusion of this testimony appellee moved for a directed verdict, which was granted by the court, and on the verdict thus rendered judgment was entered against appellant.

The defense to appellant's cause of action, sustained by the lower court, was based solely upon § 14317 of Pope's Digest as follows: ''The secret payment or allowance of rebates, refunds, commissions or unearned discounts, whether in the form of money or otherwise, or secretly extending to certain purchasers special services or privileges not extended to all purchasers purchasing upon like terms and conditions, to the injury of a competitor, and where such payment or allowance tends to destroy competition, is an unfair trade practice and any person, firm, partnership, corporation, or association resorting to such trade practice shall be deemed guilty of a misdemeanor and on conviction thereof shall be subject to the penalties set out in § 11 of this act.''

Appellant urges that the act involved herein is unconstitutional in that it contravenes the fourteenth amendment to the federal constitution and §§ 2, 18, 19 and 29 of art. II of the constitution of Arkansas, the argument being made that this act deprives the owner of his property without due process because it deprives him of his right to use, and make contracts relating to the use of, his own property.

This court has always held that, before it may strike down an act of the Legislature on the ground of unconstitutionality, it must clearly appear that the act is at variance with the constitution, that an act of the Legislature is presumed to be constitutional, and that any doubt on the question of constitutionality must be resolved in favor of the act. In the case of *Bush* v. *Martineau*, 174 Ark. 214, 295 S. W. 9, we said: ''Before proceeding to a discussion of the issues raised by this appeal, we deem it proper to premise our remarks by two funda-

mental rules of construction announced and adhered to throughout the history of this court. First, that the constitution of this state is not a grant of enumerated powers to the Legislature, not an enabling, but a restraining act (*Straub* v. *Gordon,* 27 Ark. 625), and that the Legislature may rightfully exercise its powers subject only to the limitations and restrictions of the Constitution of the United States and of the State of Arkansas. *St. L. I. M. & S. Ry. Co.* v. *State,* 99 Ark. 1, 136 S. W. 938; *Vance* v. *Austell,* 45 Ark. 400; *Carson* v. *St. Francis Levee Dist.,* 59 Ark. 513, 27 S. W. 590; *Butler* v. *Board, etc.,* 99 Ark. 100, 137 S. W. 251. In other words, as was said in *McClure* v. *Topf & Wright,* 112 Ark. 342, 166 S. W. 174: 'It is not to be doubted that the Legislature has the power to make the written laws of the state, unless it is expressly, or by necessary implication, prohibited from so doing by the Constitution, and the act assailed must be plainly at variance with the Constitution before the court will so declare it.' Second, that an act of the Legislature is presumed to be constitutional, and will not be held by the courts to be unconstitutional unless there is a clear incompatibility between the act and the Constitution; and further, that all doubt on the question must be resolved in favor of the act. *State* v. *Ashley,* 1 Ark. 552; *Eason* v. *State,* 11 Ark. 481; *Dabbs* v. *State,* 39 Ark. 353, 43 Am. Rep. 275; *Sallee* v. *Dalton,* 138 Ark. 549, 213 S. W. 762, and in *Standard Oil Co. of La.* v. *Brodie,* 153 Ark. 114, 239 S. W. 753, this court quoted the language of the Supreme Court of the United States in *Hooper* v. *California,* 155 U. S. 648, 15 S. Ct. 207, 39 L. ed. 297, that 'the elementary rule is that every reasonable construction must be resorted to in order to save the statute from unconstitutionality.' ''

Acts similar to the one involved here have been considered in other jurisdictions. In some of the cases the courts have held that this legislation is unconstitutional as an unwarranted effort on the part of the Legislatures to regulate the private business of the citizen, while in others it has been upheld as valid exercise of the police power of the state. In none of the adjudicated cases, so far as we have been able to find, has the exact question

here presented been decided. For that reason a review of these decisions would not be profitable.

The Arkansas Legislature, by § 42 of Act 266, approved March 21, 1917, repealed by Act No. 34 of the General Assembly of 1933, approved February 17, 1933, declared that "all public gins that may be operated in this state · . . . shall be charged with a public use. . . ." Since this act is no longer in force, it can have no bearing on the questions involved in the case at bar, but of some weight is the fact that certain phases of the regulation of cotton gins provided under this act were considered by this court in the case of *Page, Commissioner,* v. *Andrews,* 134 Ark. 106, 203 S. W. 273, and also in the case of *Bertig Bros.* v. *Independent Gin Co.,* 143 Ark. 347, 220 S. W. 669, and in neither case was any question as to the right of the Legislature to classify public gins as "charged with a public use" raised by the parties or by the court. Inasmuch as a legislative declaration that public gins were charged with a public use, unless they were in fact already charged with such use, would not necessarily be conclusive, it would seem that, in the consideration of those cases, there was a tacit recognition of the public use of these gins.

The Supreme Court of the United States, in the case of *New State Ice Co.* v. *Liebmann,* 285 U. S. 262, 52 S. Ct. 371, 76 L. ed. 747, referring to an Oklahoma act which declared that the business of operating a cotton gin is charged with a public use, said: "The production of cotton is the chief industry of the state of Oklahoma, and is of such paramount importance as to justify the assertion that the general importance and prosperity of the state in a very large and real sense depend upon its maintenance. Cotton ginning is a process which must take place before the cotton is in a condition for the market. The cotton gin bears the same relation to the cotton grower that the old grist mill did to the grower of wheat. The individual grower of the raw product is generally financially unable to set up a plant for himself; but the service is a necessary one with which, ordinarily, he cannot afford to dispense. He is compelled, therefore, to resort for such service to the establishment which op-

erates in his locality. So dependent, generally, is he upon the neighborhood cotton gin that he faces the practical danger of being placed at the mercy of the operator in respect of exorbitant charges and arbitrary control. The relation between the growers of cotton, who constitute a very large proportion of the population, and those engaged in furnishing the service, is thus seen to be a peculiarly close one in respect of an industry of vital concern to the general public. These considerations render it not unreasonable to conclude that the business 'has been devoted to a public use and its use thereby, in effect, granted to the public'.''

In the case of *Tallassee Oil & Fertilizer Company* v. *Holloway,* 200 Ala. 492, L. R. A. 1918A, 280, 76 So. 434, the Supreme Court of Alabama sustained an injunction against the operator of a gin, by which he was enjoined from refusing to gin cotton for anyone who refused to sell the operator of the cotton gin his cottonseed, and based its decision on the declaration that when one ''undertakes the ginning of cotton for the public his gin is dedicated to the public use, and . . . it becomes clothed with a public interest affecting the community at large and subject to governmental regulation.''

We conclude that the business of operating a public cotton gin is impressed with a public interest, and, therefore, the provisions of § 14317 of Pope's Digest as applied to the case at bar, and, in so far as they render illegal a secret and discriminatory rebate that would tend to destroy competition in the business of public ginning, constitute a valid exercise of the power of the legislature to regulate any business dedicated to a public use. ''All the authorities, including the recent cases, state that one who devotes his property to a use in which the public has an interest in effect grants to the public an interest in that use and must submit to be controlled by the public, for the common good, to the extent of the interest he has thus created.'' 11 Amer. Jur. 1059.

But the regulatory law which forms the basis of appellee's defense herein does not forbid all rebates nor does it make illegal all agreements for rebates. Before

any agreement for a rebate can be said to violate the provisions of this act such rebate must: First, be secret; second, not be paid to all patrons upon like terms and conditions; and, third, must tend to destroy competition. It devolved upon appellee to show that all these requisites of illegality existed.

Since, on this appeal, we are determining the correctness of the circuit court's action in giving a peremptory instruction in favor of appellee, we must give to the testimony the strongest probative force in favor of appellant that such evidence will reasonably bear. "In determining, on appeal, the correctness of the trial court's action in directing a verdict for the defendant, the rule is to take that view of the evidence that is most favorable to the plaintiff." (Headnote) *LaFayette* v. *Merchants' Bank,* 73 Ark. 561, 84 S. W. 700; *Brigham* v. *Dardanelle & Russellville Railway Company,* 104 Ark. 267, 149 S. W. 90. Applying this rule to the testimony in this case it cannot be said that the illegality of the agreement to pay the rebate to appellant was established.

In the first place, there was testimony indicating that the fact that the gin company was paying rebates on ginning charges was known to numerous farmers. Whether, under the circumstances shown, the agreement for the rebate was a secret one was a question of fact for a jury to settle. In the second place, the evidence tended to establish that rebates in varying amounts were actually being paid to other farmers who had their cotton ginned at the Koser gin. In the third place, there was testimony from which it might be deduced that the payment of the rebate by appellee to appellant did not tend to destroy competition. Under some circumstances it could be properly inferred that such a course of action would adversely affect competition, but the testimony does not show that other ginners in the neighborhood were not engaged in a similar practice. There was some testimony to show that another ginner was offering even a larger rebate than did appellee. If other ginners were granting this rebate then a jury might properly find that the offer of appellee to give this rebate was a general one made in an effort to meet competition rather than to destroy it.

The testimony adduced, susceptible as it was of inferences that were, to say the least of it, as compatible with legality of the contract as with illegality thereof, should have been submitted to the jury with instructions to determine whether the agreement for rebate was a secret one, whether the rebate was available to other farmers under like terms and conditions, whether such rebate was injurious to appellee's competitors, and whether it tended to destroy competition.

The judgment of the lower court is accordingly reversed and the cause remanded for new trial.

SMITH, J., not participating.