**IDEAL PLUMBING COMPANY,**
Plaintiff,

v.

**BENCO, INC., and Zapata Warrior
Construction, Defendants.**

**Civ. A. No. T–73–C–70.**

United States District Court,
W. D. Arkansas,
Texarkana Division.

Sept. 2, 1974.

Young & Patton, and Arnold, Arnold & Lavender, Texarkana, Ark., for plaintiff.

Wilson & Guest, Houston, Tex., Smith, Williams, Friday, Eldredge & Clark, Little Rock, Ark., and Wheeler, Watkins & Merriman, Texarkana, Tex., for defendants.

## MEMORANDUM OPINION

WILLIAMS, Chief Judge.

The plaintiff, Ideal Plumbing Company, filed this action against the defendants, Benco, Inc., and Zapata Warrior Constructors, alleging unfair trade practices and anti-trust law violations. More particularly the plaintiff alleged that the violations arose under

". . . . Sections 1 and 2 of the Sherman Anti-trust Act, 15 U.S.C. §§ 1, 2, Section 2(c) of the Clayton Act, as amended by the Robinson Patman Act, 15 U.S.C. § 13(c), Section 4 of the Clayton Act, 15 U.S.C. § 15, Sections 7 and 10 of Act 253 of the Arkansas General Assembly of 1937, Arkansas Statutes §§ 70–307, 70–310, and the Common Law of Arkansas."

The suit was filed by the plaintiff in connection with construction on the expansion of St. Michael Hospital in Texarkana, Arkansas. Zapata Warrior was the prime contractor for the project and the subcontract for the "mechanical contract" part of the work was awarded to Benco, Inc., for the sum of $697,900.00.

Ideal contended it was entitled to receive the subcontract because its base bid of $697,529.00 was lower than Benco's; further that Benco received the contract because of an illegal reduction of $1,100.-00 from its original bid, pursuant to an agreement, combination and conspiracy between Benco and Zapata, all of which were allegedly made with the intent and effect of destroying Ideal as a competitor for the "mechanical contracting" subcontract and all in violation of the anti-trust laws of the United States.

Plaintiff also contended that defendants violated both the Federal statutes and the Arkansas Unfair Trade Practices statute, in that defendant Benco secretly paid or allowed to Zapata Warrior Construction Company a rebate, refund, commission, brokerage or unearned discount, either in the form of money or otherwise; thereby unreasonably excluding plaintiff from effective competition in connection with the mechanical subcontract.

Plaintiff prayed for compensatory damages, treble damages (as allowed by both the Arkansas and Federal Statutes) costs and attorneys fees.

Both defendants specifically denied that either had violated any Federal or State statutes; and Zapata denied that there was any express or implied agreement to award the subcontract to the low bidder. Both defendants admitted that Benco's bid was reduced by $1,100.00 before the subcontract was let, but contended the reduction was made for legitimate business reasons.

The complaint as originally filed contained six claims, one of which was withdrawn before trial. The remaining five claims were submitted to the jury on spe-

cial interrogatories. The interrogatories and the answers are as follows:

## INTERROGATORIES TO BE ANSWERED

You shall return your verdict by supplying answers to the following questions:

1. Did Benco, Inc., engage in a contract, agreement, combination, or conspiracy in violation of Sec. 1 of the Sherman Act?

Answer "Yes" or "No"

Answer: "No"

2. Did Zapata Warrior engage in a contract, agreement combination, or conspiracy in violation of Sec. 1 of the Sherman Act?

Answer "Yes" or "No"

Answer: "No."

3. Did Benco, Inc., make a payment, allowance, or discount to Zapata Warrior Constructors, Inc., in violation of Sec. 2(c) of the Clayton Act? (Also called Robinson-Patman Act)

Answer "Yes" or "No."

Answer: "Yes."

4. Did Zapata Warrior Constructors, Inc., accept or receive a payment, allowance, or discount from Benco, Inc., in violation of Sec. 2(c) of the Clayton Act? (Robinson-Patman)

Answer "Yes" or "No"

Answer: "Yes"

5. Did Benco, Inc., violate the Arkansas Unfair Practices Act?

Answer "Yes" or "No."

Answer: "Yes."

6. Did Zapata Warrior Constructors, Inc., violate the Arkansas Unfair Practices Act?

Answer "Yes" or "No."

Answer: "Yes."

7. Did Benco, Inc., commit a tortious interference with the reasonable expectation of a business relationship between Ideal Zapata Warrior?

Answer "Yes" or "No."

Answer: "No."

8. Did Zapata Warrior Constructors, Inc., commit a tortious interference with the reasonable expectation of a business relationship between Ideal and Zapata Warrior?

Answer "Yes" or "No."

Answer: "No."

9. Did Zapata Warrior break an implied agreement with Ideal to accept the lowest responsible bid it received?

Answer "Yes" or "No."

Answer: "No."

10. If you have answered "Yes" to any of the preceding questions, state the amount of actual damages sustained by Ideal by reason of any such violation.

$28,000.00.

/s/ Wayne Ratliff
Foreman

8/2/74.

Date

As indicated, the jury found against the plaintiff on three of the five claims and against the defendants on two of the five claims and found damages for Ideal Plumbing Company in the sum of $28,-000.00. One claim on which the jury found for the plaintiff was based on Section 2(c) of the Robinson-Patman Act and the other on the Arkansas Unfair Trade Practices Act.

Defendants had filed Motions for Summary Judgment prior to trial of the cause; and at the close of the plaintiff's evidence both defendants filed written motions for directed verdicts, and again at the close of all the evidence. All motions were overruled by the Court.

After the jury verdict for the plaintiff on the two claims, the defendants timely filed their respective motions for judgment notwithstanding the verdict under Rule 50(b) of the Federal Rules of Civil Procedure, and defendant Zapata also requested a new trial in the alternative.

This Court is well aware of the importance of the Anti-Trust laws, and the salutary effect in the public interest of enforcement thereof, by private civil suits for triple damages, to effectuate discouragement of anti-competitive practices by large corporations.

The Court also recognizes that the verdict of the jury should not be lightly set aside—certainly not for the mere reason that the Court may happen to disagree with the verdict. The law contemplates, however, that the Court will measure up to its responsibility and act in accordance with its considered evaluation of the record. Consequently, it is now the duty of the Court to consider the motion for judgment notwithstanding the verdict, even though the case was first sent to the jury. In the case of Wright v. Atchison, Topeka and Santa Fe Railway Co., 254 F.Supp. 308 (W.D.Mo.1966) the Court said:

"The fact that we sent these cases to the jury is immaterial. The practice of sending doubtful cases to the jury is commended in Green v. Reynolds Metals Company, 5 Cir. 1964, 328 F.2d 372."

In Greer v. United States, 408 F.2d 631 (6th Cir., 1969) the Court stated:

"The trial judge having denied defendant's motion for directed verdict at the close of all the evidence properly reconsidered the question on motion for judgment notwithstanding the verdict. (Rule 50(b) F.R.Civ.P.)"

In Donald v. UARCO Business Forms, 344 F.Supp. 338, a judgment n. o. v. in a copyright case, was affirmed by the 8th Circuit, 478 F.2d 764 (1973). The district court in discussing the evidence in the *Uarco Business Forms* case quoted the following from the case of Dun & Bradstreet v. Nicklaus, 340 F.2d 882 (8th Cir. 1965):

"When the sufficiency of the evidence is questioned, the Arkansas and Federal courts will view the evidence in the light most favorable to the plaintiff. Superior Forwarding Co. v. Garner, 236 Ark. 340, 366 S.W.2d 290;

Aetna Life Ins. Co. v. McAdoo, 8 Cir., 115 F.2d 369; Stofer v. Montgomery Ward, 8 Cir., 249 F.2d 285."

In England v. Chrysler Corp., 493 F.2d 269 (9th Cir. 1974) the Court of Appeals affirmed the action of the District Court entering a judgment n. o. v. for the defendant in an antitrust case filed against an automobile manufacturing company and its subsidary. In a footnote therein the court said:

"We are mindful of the trial judge's duty not to invade the province of the jury. Therefore, we have drawn all inferences favorably to Sunset and have tested the evidence by a standard asking whether reasonable men might find that the facts amounted to a Sherman Act violation. See, e. g., Standard Oil v. Moore, 251 F.2d 188, 198 (9th Cir. 1957), cert. denied, 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148 (1958)."

The court then stated:

"We find, however, that Sunset has not proved, by *sufficient evidence* that Chrysler's conduct was culpable. . ." Emphasis added.)

When we examine the evidence, the briefs, oral arguments, and the transcript of the trial, even in the light of the cited cases, we have concluded that the evidence on the issues is wholly insufficient to sustain the judgment. Further, that there is no substantial evidence from which the jury might have concluded that the defendants violated either the Federal or State statutes in question.

Section 2(c) of the Robinson-Patman Act [15 U.S.C. Section 13(c)] provides that:

"(c) It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, rep-

resentative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid."

■ This Section was not designed to apply to all contracts—only those which are primarily sales of goods, wares or merchandise. Where the question arises as to whether or not a particular transaction falls within this category, the fact that some items of merchandise are involved does not necessarily mean that the contract meets this test. Only if the dominant nature of the contract, when viewed as a whole, is that of a sale of goods, wares or merchandise, does this section apply.

In nearly all construction contract situations, the material used therein is a major cost factor. However, this fact alone does not make the dominant nature of the contract a sale of goods, wares or merchandise. Ordinarily the contractor does not sell material components, he agrees to erect a completed, operational structure or portion thereof.

The evidence in this case reflects that the subcontract herein was a construction contract and not primarily one for the sale of goods, wares or merchandise. The testimony of plaintiff's witness, Mr. Jimmy Washington, was to the effect that the subcontract, although involving items of materials, was actually for the construction of a complete workable mechanical system of plumbing, heating, ventilating and air conditioning.

Another witness of plaintiff, the President of Ideal, Mr. Roy Washington, also testified to the effect that the primary purpose of the contract was for the installation of a complete system of mechanical work for the general contractor and owner. Further, the subcontract entered into between Benco and Zapata Warrior reflects that the object of the owner was to secure the erection, construction and completion of additions and alterations to St. Michael Hospital as per the plans and specifications, and not the purchase of goods, wares or merchandise. The subcontract document itself further reflects that Benco was to perform all work necessary for "the complete mechanical installation" of the plumbing, heating, ventilating and air conditioning.

Another factor in determining whether this subcontract was a construction contract was whether Benco made a lump sum bid for construction of the mechanical work including everything, or made a bid for individual items of goods, wares, and merchandise. The evidence shows clearly that Benco made a lump sum bid for construction of the mechanical work. Further, the subcontract itself reflects that there was one contract price, which was not broken down or itemized into individual terms of goods, wares, and merchandise.

The subcontract also provided for payment to Benco on the basis of proportionate performance of the construction work. This factor too would indicate this to be a construction contract. This is specifically spelled out in item 14 of the subcontract which states "before any payments are made hereunder, subcontractors shall submit to contractor a fair and proper itemized schedule for all of the work included in this contract, and payment shall be made to subcontractor in proportion to said schedule less the agreed retention."

The subcontract further states that monthly payments shall be paid to the subcontractor as the work progresses and based upon the percentage of completion of the entire subcontract. Thus, all of these factors, when viewed as a whole, clearly demonstrate that the dominant nature of the subcontract between Benco and Zapata Warrior was a construction contract.

In General Shale Products Corporation v. Struck Construction Company, 132 F. 2d 425 (6th Cir. 1942) the City of Louisville Municipal Housing Commission awarded a contract for the entire construction of extensive housing facilities to the Struck Company. The Struck Company, as general contractor, subse-

quently entered into an agreement with a subcontractor to perform a portion of the work. Shale Products Corporation brought suit against the General contractor, because it had not received the subcontract and alleged violations of the Robinson-Patman Act. The trial court held that the contract involved was a construction contract not subject to the Robinson-Patman Act and the Sixth Circuit Court of Appeals affirmed. After an extensive review of the evidence, the Court of Appeals on page 428 stated:

> "The Struck Company did not sell the brick in question to the Commission, and cannot be held guilty of discriminating in prices between different purchasers as a consequence of the transaction. The object of the Commission was to secure the construction of extensive housing facilities. The Struck Company made a lump sum bid for the entire work . . . the contract could not be said to be one for the sale of brick. The Commission would not be required to pay for a delivery of brick; and payments were made by the Commission to the Struck Company on the basis of the proportionate performance of the contract . . . the transaction, eventually completed, was not divisible into a contract for work and labor, and a contract for the sale of brick. . . .

> "The Commission contracted for the completion of 59 building units and approximately 800 living room units. It is obvious that the Commission would not, and did not, agree to accept 2,-000,000 brick at a stated price, apart from the agreement of the contractor to complete the work of construction, and, likewise, it cannot be maintained that the Struck Company would supply such a quantity of brick at a great loss to itself, unless the transaction were woven into the general agreement entitling it to receive a fixed sum for furnishing labor and materials and completing the building operation. *The agreement was not for a transfer of chattels, or the sale of personal property, but was clearly a construc-*

*tion contract.* Because there was no sale of a commodity by the Struck Company, it could not be guilty of discrimination in the price of a commodity to the Commission." (Emphasis supplied.)

Factual similarities in the *General Shale* and the case at bar are quite evident. The object of the St. Michael Hospital contract was to secure the construction of additions and alterations to the hospital facilities. Benco made a lump sum bid for the entire mechanical subcontract work, not a bid for individual items of goods, wares, and merchandise. Payments were made by Zapata Warrior to Benco on the basis of the proportionate performance of the contract.

The district court for the northern district of California followed the reasoning of the *General Shale* case in its decision in United States v. San Francisco Electric Contractors Association, 57 F.Supp. 57 (1944). The Court stated on page 67:

> "It is also the rule in California and elsewhere that an agreement to build a structure according to another's plans and specifications *is not an agreement of sale of any of the materials* which may enter into its composition . . .

> . . . . . .

> "You cannot take a composite process of construction and the contractual dealings leading to its achievement, split them into their component elements, chose one of them, and, by withdrawing it from the combination, give to it a separate being. When you do this, you substitute unrealistic abstraction from the realm of reality. For the element thus sought to be segregated has no such separate existence. It is but a segment of the whole." (Emphasis added.)

In further discussing whether the contract could be broken into separate parts, the court stated on page 68:

> "[I]t . . . . is a part of a broader undertaking to do electrical con-

struction, in the completion of which the material may be used. It is integrated into the whole and cannot be severed from it. The weaver may weave many strands into his web; each may add to the pattern, but the product of the loom is the completed fabric."

In the recent case of Stutzman Feed Service, Inc., v. Todd and Sargent, Inc., 336 F.Supp. 417 (S.D.Iowa 1972) the court quoted with approval the *General Shale* case, and reaffirmed the principle that the dominant nature of the contract determines whether it is a construction contract.

█ For all the foregoing reasons this court reaches the same conclusion reached in the *General Shale* case, supra, "The agreement . . . was clearly a construction contract;" and consequently not subject to the provisions of the Robinson-Patman Act.

█ Aside from this determination, plaintiff must also fail in its contention that Benco made a payment allowance or discount to Zapata Warrior and that such was made as, or in lieu of, a commission or brokerage fee. The accepted definition of a "Commission" and the one used in the instructions given by the court is that a "commission" or "brokerage" is the compensation that a seller would ordinarily pay his own salesman or broker for the service of arranging a sale.

In the case of Federal Trade Commission v. Henry Broch & Co., 363 U.S. 166, 80 S.Ct. 1158, 4 L.Ed.2d 1124, the Supreme Court held that in enacting Section 2(c) commonly known as the brokerage section of the Clayton Act, the prime concern of Congress was to curtail price discriminations accomplished by Pseudobrokerage arrangements. The Court further stated that the legislative history demonstrates a congressional intent to proscribe other practices such as the bribing of a seller's broker by the buyer.

There was no testimony that Benco had a salesman or broker involved in anyway in bribery or in arranging any sale; nor was there any testimony that the reduction was in the nature of a commission or brokerage.

In the case of Robinson v. Stanley Home Products, Inc., 272 F.2d 601 (1st Cir. 1959), the Court stated on page 603:

"Plaintiff here claims under subsection (c) of section 2 of the Robinson-Patman Act, and no others. The specific question under that subsection is whether Stanley accepted from Plura 'a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof. . . .' On the facts alleged, after plaintiff's discharge Plura paid no commission, as such, to anyone. The next question, therefore, is whether plaintiff sufficiently shows an 'allowance or discount in lieu thereof' within the meaning of the act . . . [*w*]*hile a reduction in price to the buyer could fall within this definition, obviously not . every one would do so. The question must be, what was the purpose of, or the reason for, the reduction?* Plaintiff pleads only his unsupported conclusion that it was a discount in lieu of brokerage. He does not allege that the parties so described it; or that it was designed to reimburse Stanley for some brokerage or servicing obligation ostensibly incurred, or even that it was the mathematical equivalent of what Plura formerly paid to the Plaintiff. All that appears is that Plura would not have been able to make this reduction if it still paid brokerage. To say that a manufacturer who makes a price reduction when he converts to direct selling has, without more, made an allowance in lieu of brokerage would either be to say that he cannot so convert, or that, if he does, the act forbids his passing on any saving to the customer. We do not so construe it." (Emphasis added.)

See also Central Retailer-Owned Grocers, Inc. v. F. T. C., 319 F.2d 410 (7th Cir. 1963).

█ The evidence reflects that Benco agreed to reduce its price while bargaining or negotiating with Zapata Warrior

in attempting to arrive at an agreed contract price. It was only after Benco reduced its bid price by $1,100.00 and Zapata Warrior agreed to assume additional responsibility on the job in return therefor, that the final subcontract price was agreed upon. Reductions made by a bargaining potential seller in attempting to arrive at an agreed contract price with a potential buyer are not regarded as brokerage commissions or as discounts or allowances in lieu of brokerage.

The testimony of Mr. Ben Cobb and Mr. Francis Forehand indicated that Benco had included in its bid the figures of $500 for concrete inertia bases and $1,000 for boiler room concrete work. The fact that Benco was relieved of the responsibility for doing this work reflects an adequate legitimate reason for the reduction in the amount of the contract price.

The Arkansas Unfair Practices Act— Ark.Stats.Ann. 70–307 reads in part as follows:

"The secret payment or allowance of rebates, refunds, commissions, or unearned discounts, whether in the form of money or otherwise, or secretly extending to certain purchasers special services or privileges not extended to all purchasers purchasing upon like terms and conditions, to the injury of a competitor and where such payment or allowance tends to destroy competition, is an unfair trade practice. . . ."

This Act was passed in 1937, shortly after the Robinson-Patman Act amendment of 1936. The Arkansas Act, as well as other acts were obviously passed in response to the Robinson-Patman Act and enacted in the same atmosphere existing at that time. They were designed to prohibit similar types of business conduct. In the case of Martin v. Aleinikoff, 63 Wash.2d 842, 389 P.2d 422 (1964) the Washington Supreme Court stated on page 430:

"While the statutory wording differs substantially from that of the Robinson-Patman Act, it appears that both statutes are designed to prohibit similar types of business conduct. . . . [I]t seems clear that *competitive injury* is a requirement under this section of the Unfair Practices Act." (Emphasis added.)

Thus, the reasoning and interpretation of the court decisions under the Robinson-Patman Act also apply to the Arkansas Unfair Practices Act and we have already found no violation of that Act.

Although the Arkansas Unfair Practices Act was enacted in 1937, there have been only a few cases arising under it. Baratti v. Koser Gin Company, 206 Ark. 813, 177 S.W.2d 750 (1944); Arkansas State Board of Optometry v. Keller, 218 Ark. 820, 239 S.W.2d 14 (1951); Concrete, Inc. v. Arkhola Sand and Gravel Co., 228 Ark. 1016, 311 S.W.2d 770 (1958); Concrete, Inc. v. Arkhola Sand and Gravel Co., 230 Ark. 315, 322 S.W.2d 452 (1959), and Energy Oil Company v. Rose Oil Co. of Pine Bluff, 250 Ark. 484 465 S.W.2d 690 (1971).

A review of these cases indicate that none concerned a situation even similar to the case at bar; each of these cases was concerned with the sale of a specific product or item.

In the later, Concrete Inc. v. Arkhola Sand & Gravel Co., case, supra, the court in speaking of the purpose of the act stated, "to prevent a business from destroying competition by depressing prices in one locality where there is competition and offsetting the loss by raising the prices in another locality where there is no competition."

It is also significant that Baratti v. Koser Gin Co., supra, and the other Arkansas cases interpreting this Act require proof that the payment or allowance must tend to destroy competition. There is no evidence in the record of any adverse effect on competition. The only evidence pertaining to competition is the testimony from the President of Plaintiff's Company that Plaintiff has increased its income, grown in size, and has bid and obtained larger contracts

since the awarding of the subcontract by Zapata Warrior to Benco.

■ For the reasons heretofore set out by the court we find that Benco agreed to reduce its bid while bargaining and negotiating with Zapata Warrior in attempting to arrive at an agreed contract price and consequently the $1,100 reduction cannot be regarded as a violation of any of the practices prohibited by the Ark. Unfair Practices Act. The reduction was clearly reflected in the final subcontract and was not secret in any way.

■ As to damages, in order to recover, Plaintiff must first prove by a preponderance of the evidence that it has been injured as a proximate result of some unlawful act by the defendants. That is, it must first establish the fact of injury before the jury is allowed to determine the amount of injury.

In answer to Interrogatories 7 and 8 as indicated supra, the jury found that neither Benco, Inc., nor Zapata Warrior committed tortious interference with Ideal's expectation of business relationship with Zapata Warrior.

Further in response to Interrogatory 9—"Did Zapata break an implied agreement with Ideal to accept the lowest responsible bid it received?"

The Jury answered "No."

Roy Washington, President of Ideal, testified that "There is no way you can force a general contractor to give you the job," and his further testimony that "If the general contractor wants to give you a job they do, and if not, they don't."

His entire testimony reflected no express agreement, no implied agreement, nor any reasonable expectation of receiving the subcontract.

The evidence reflected that Zapata considered several factors in determining which of the two subcontractors could handle the mechanical work in the more satisfactory manner. These factors included among other things experience in the field, financial background and it is also undisputed that Ideal had never previously handled a contract of this magnitude. Regardless of reason for the decision Mr. James Gribble, the President of Zapata Warrior, testified: "I would not have awarded the subcontract to Ideal." There is no testimony to the contrary. Thus Ideal failed to prove injury as a result of any culpable acts of either defendant.

Furthermore, evidence of damage must be more than speculative, it must be established "with reasonable probability." In Flintkote Company v. Lysfjord, 246 F.2d 368 (9th Cir. 1957), it was pointed out on page 392:

"We take it that the controlling rule today in seeking damages for loss of profits in anti-trust cases is that the plaintiff is required to establish with reasonable probability the existence of some causal connection between defendant's wrongful act and some loss of anticipated revenue. . . . The cases have drawn a distinction between the quantum of proof necessary to show the *fact* as distinguished from the *amount* of damage; the burden as to the former is the more stringent one. In other words, the *fact* of injury must first be shown before the jury is allowed to estimate the *amount* of damage." (Emphasis by the Court.)

That this rule is followed in the Eighth Circuit was established in the case of Morning Pioneer, Inc. v. Bismarck Company, 493 F.2d 383 (8th Cir. 1974) where the Court stated on page 387:

"[I]t is not enough for recovery of damages to prove that an antitrust law was violated by the defendant. . . . Rather, the rule is that damages may not be awarded to a litigant unless he also proves 'with a fair degree of certainty, the fact of damage and the causal connection between the antitrust violation and the injury.'" (Numerous supporting citations follow.)

The testimony from plaintiff's witnesses reflects that its estimate of lost profits was purely speculative. Mr. Travis Partain testified that the plain-

tiff's estimating on this job was not set up to cover overhead. He further testified that although overhead would be attributable to this job, he did not know how much would be overhead. Mr. Jimmy Washington testified that the profit on this particular job would be a guess and that Ideal could lose money on this job. Mr. Roy Washington, the President of Ideal Plumbing Company, testified that "Most profits are a guess." He further stated that the contracting business is highly speculative and an estimate of profits is "pretty much so a guess or conjecture". Concerning the bid preparation expenses, Mr. Roy Washington testified that "most jobs you figure you waste time on because you are not going to get it."

The Eighth Circuit in Morning Pioneer, Inc. v. Bismarck Tribune Company, supra, held that a finding of damages based upon testimony similar to that in the case at bar would be impermissible; the court stated:

"[T]he fault lies in the plaintiff's failure to introduce any evidence as to the value of its grocery advertisement, normal or actual, during the five-week period. The plaintiff's witness merely related that the loss was one-third of the normal. To have awarded more than nominal damages under these circumstances would have been to engage in impermissible speculation and conjecture."

The Fifth Circuit has followed the same reasoning in the case of Terrell v. Household Goods Carrier's Bureau, 494 F.2d 16 (5th Cir. 1974), where the Court held that in a private anti-trust suit damages may not be determined by mere speculation or guess.

The Court finds as a matter of law that the dominant nature of the Zapata Warrior-Benco subcontract was for construction, and was not a sale of goods, wares or merchandise. Further, there is no evidence in the record of any payment allowance or discount made as, or in lieu of, a commission or brokerage fee by Benco in violation of Section 2(c) of the Robinson-Patman Act. It is also clear that there was no rebate, refund, commission, or unearned discount under the Arkansas Unfair Practices Act and consequently no violation of the Arkansas Statutes. Furthermore, there was no competent substantial evidence to support any award of damages.

Accordingly, the jury verdict for the plaintiff must be set aside and judgment notwithstanding the verdict entered by the Court for both defendants.