**IDEAL PLUMBING COMPANY,**
**Appellant,**

v.

**BENCO, INC., and Zapata Warrior**
**Constructors, Appellees.**

**No. 74–1891.**

United States Court of Appeals,
Eighth Circuit.

Submitted April 17, 1975.

Decided Feb. 2, 1976.

Nicholas H. Patton, Texarkana, Ark., for appellant.

E. Lawrence Merriman, Texarkana, Tex., for Benco.

Austin C. Wilson, Houston, Tex., for Zapata.

Before ROSS, STEPHENSON and WEBSTER, Circuit Judges.

WEBSTER, Circuit Judge.

Ideal Plumbing Company initiated this antitrust and unfair trade practice action against Benco, Inc., and Zapata Warrior Constructors, claiming that it was illegally deprived of the mechanical subcontract on the construction of an addition to Saint Michael Hospital in Texarkana, Arkansas. Following a jury trial in which Ideal obtained a favorable verdict on two counts, the District Court [1] entered judgment for defendants notwithstanding the verdict and this appeal followed. *Ideal Plumbing Co. v. Benco, Inc.,* 382 F.Supp. 1161 (W.D.Ark.1974).

Zapata, a general contractor, had solicited bids from three mechanical subcontractors, including Ideal and Benco, for the installation of plumbing, ventilation, and heating and air conditioning systems in the expansion of Saint Michael Hospital. Ideal and Benco submitted bids on the subcontract of $698,729.00 and $699,000.00, respectively, while the third bid received by Zapata was substantially in excess of these amounts.[2]

Zapata's bid for the prime contract was based in part upon the low base bid it had received from Ideal. Following the bid opening, the prime contract was awarded to Zapata. Zapata, however, did not immediately award the mechanical subcontract. After further analysis of the bids, an employee of Zapata requested Benco to reduce its bid to $697,900.00, a reduction of $1,100.00. Benco advised Zapata that this reduction would be accepted if Zapata undertook the responsibility for performing certain concrete work and painting that had been initially included in the bid by Benco.

---

1. The Honorable Paul X Williams, Chief Judge, United States District Court for the Western District of Arkansas.

2. There is some dispute in the record with respect to the ultimate figure tendered by Ideal and the actual difference in amount between the two bids. It is not disputed that Ideal's bid was lower than Benco's bid.

After agreement on these modifications, Benco was awarded the mechanical subcontract for the project on the basis of its reduced bid.

Ideal thereafter brought an action against Benco and Zapata alleging violations of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2; Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c); and Section 7 of the Arkansas Unfair Trade Practices Act, Ark. Stat.Ann. § 70–307. In its complaint, Ideal further contended that the conduct of the defendants constituted a tortious interference with Ideal's reasonable expectation of a contractual relationship with Zapata and that Zapata was in breach of an implied contract to award the project to the lowest responsible bidder.

At trial, Ideal abandoned its claim under Section 2 of the Sherman Act, and the case was submitted to the jury on the remaining five claims by special interrogatories. See Fed.R.Civ.P. 49. The jury found that the defendants had not unreasonably restrained trade in violation of Section 1 of the Sherman Act, that they had not tortiously interfered with any reasonable contractual expectation of Ideal, and that there was no breach by Zapata of any implied contract. On the other hand, the jury found that both Benco and Zapata had violated Section 2(c) of the Robinson-Patman Act as well as Section 7 of the Arkansas Unfair Trade Practices Act. Damages on both counts were assessed by the jury at a pre-trebled total of $28,000.00.

On defendants' motion for judgment notwithstanding the verdict or for new trial, the District Court set aside the verdict for Ideal in its entirety, and entered judgment for the defendants. See Fed. R.Civ.P. 50(b). The District Court held, as a matter of law, that the Robinson-Patman Act had not been violated by the defendants for three independent reasons: (1) there had been no sale of "goods, wares, or merchandise" by Benco to Zapata; (2) there had been no payment by Benco to Zapata of any sum "in lieu of commission or brokerage"; and (3) the reduction in price was made in exchange for services rendered by Zapata, thus invoking the statutory exception contained in Section 2(c). With respect to the state law claim, the District Court held that there was no "rebate, refund, commission, or unearned discount" within the meaning of the Arkansas Unfair Trade Practices Act, and that, in any event, any payment made by Benco to Zapata was not "secret" within the meaning of that statute. The District Court further held that Ideal had failed to prove injury to itself under either statute, and thus that the damage award was unsupported by the evidence.

Ideal appeals, claiming that the District Court erred in entering judgment for defendants notwithstanding the verdict. We affirm the judgment of the District Court, although on somewhat more narrow grounds.

## I

Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c), provides:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid.

■ The wake of the Supreme Court decision in *Federal Trade Commission v. Henry Broch & Co.*, 363 U.S. 166, 80 S.Ct. 1158, 4 L.Ed.2d 1124 (1960), produced considerable uncertainty with respect to the intended scope of this broadly

worded section.[3] *See* Rowe, *Price Discrimination Under the Robinson-Patman Act* 330 (1962); Rill, *Brokerage Under the Robinson-Patman Act: Toward a New Certainty*, 41 Notre Dame Law. 337 (1966). It seems reasonably clear, however, that a principal objective of the section was to prevent the payment of "dummy commissions" to an agent of a

seller or a buyer with sufficient leverage to compel a price concession.[4] *See Federal Trade Commission v. Henry Broch & Co., supra*, 363 U.S. at 168–69, 80 S.Ct. at 1160; *Federal Trade Commission v. Simplicity Pattern Co.*, 360 U.S. 55, 69, 79 S.Ct. 1005, 3 L.Ed.2d 1079 (1959). Historically, chain operations and other large buyers were able to reclaim such

**3.** Prior to the decision in *Broch*, the extent of the Section 2(c) proscription was viewed as uniquely settled. *See* Austin, *Price Discrimination and Related Problems Under the Robinson-Patman Act* 106 (2d ed. 1959); Edwards, *The Price Discrimination Law* 92 (1959). As explained in ABA Antitrust Section, *Antitrust Developments: 1955–1968* 144 (1968):

> The 1955 [Report of the Attorney General's National Committee to Study the Antitrust Laws] concluded that then outstanding interpretations had turned the brokerage provision into a flat prohibition of "the payment of middleman's commissions to any but pure 'brokers'" by making any such payment "*per se* illegal, even though valuable distributive services are performed, even when no adverse competitive effect results, and even where the challenged concession reflects actual savings in the seller's distribution costs." (footnote omitted)

Moreover, dicta in *Federal Trade Commission v. Simplicity Pattern Co.*, 360 U.S. 55, 65, 79 S.Ct. 1005, 3 L.Ed.2d 1079 (1959), a Section 2(e) case, seemed to buttress these interpretations.

The decision in *Broch*, the first Section 2(c) matter heard by the Supreme Court, unsettled this interpretation by emphasizing that discrimination is in fact an element of the statutory proscription. The facts in *Broch* concerned a broker who informed its seller-client of a reduced purchase price sought by a buyer and then agreed to the client's demand that the brokerage be reduced as a condition of granting a reduced price to the buyer. The Court found that the broker had indirectly passed on a portion of the normal brokerage allowance to the buyer through the seller in violation of Section 2(c). It cautioned, however, that there would have been "quite a different case" had "the buyer rendered any services to the seller or to the [broker]", or had "anything in its method of dealing justified its getting a discriminatory price by means of a reduced brokerage charge." 363 U.S. at 173, 80 S.Ct. at 1163. The *Broch* Court thus did not suggest that all discriminatory payments or allowances would be violative of Section 2(c); rather, it is apparent that only those discriminatory practices which are sufficiently without justification to constitute an abuse of the brokerage function are prohibited. The pre-*Broch* certainty of application was thus re-

placed with a more flexible interpretation which comports with the basic purpose of the statute.

**4.** The Senate Judiciary Committee Report on this amendment of the Clayton Act stated:

> Among the prevalent modes of discrimination at which this bill is directed, is the practice of certain large buyers to demand the allowance of brokerage direct to them upon their purchases, or its payment to an employee, agent, or corporate subsidiary whom they set up in the guise of a broker, and through whom they demand that sales to them be made. Whether employed by the buyer in good faith to find a source of supply, or by the seller to find a market, the broker so employed discharges a sound economic function and is entitled to appropriate compensation by the one in whose interest he so serves. But to permit its payment or allowance where no such service is rendered, where in fact, if a "broker," so labeled, enters the picture at all, it is one whom the buyer points out to the seller, rather than one who brings the buyer to the seller, is but to permit the corruption of this function to the purposes of competitive discrimination. The relation of the broker to his client is a fiduciary one. To collect from a client for services rendered in the interest of a party adverse to him, is a violation of that relationship; and to protect those who deal in the streams of commerce against breaches of faith in its relations of trust, is to foster confidence in its processes and promote its wholesomeness and volume.

S.Rep.No.1502, 74th Cong., 2d Sess. 7 (1936). *See also* H.R.Rep.No.2287, 74th Cong., 2d Sess. 14–15 (1936); Final Report on the Chain-Store Investigation, S.Doc.No.4, 74th Cong., 1st Sess. (1935).

The Supreme Court recognized in *Broch* that:

> [This] was not the only means by which the brokerage function was abused and Congress in its wisdom phrased § 2(c) broadly, not only to cover the other methods then in existence but all other means by which brokerage could be used to effect price discrimination.

363 U.S. at 169, 80 S.Ct. at 1160 (footnotes omitted).

concessions through "dummy" brokers or, alternatively, to deal directly with the seller and demand a price concession in lieu of the brokerage which the seller was otherwise prepared to pay for independent brokerage services. In each instance, no real services were performed by the broker, and competitive price discrimination was the necessary result.

Congress also intended Section 2(c) to reach price arrangements equivalent to illicit brokerage, such as commercial bribery, which it deemed contrary to public policy in a manner distinctly independent of such considerations as adverse impact upon competition. *See Rangen, Inc. v. Sterling Nelson & Sons, Inc.*, 351 F.2d 851, 858–59 (9th Cir. 1965), *cert. denied*, 383 U.S. 936, 86 S.Ct. 1067, 15 L.Ed.2d 853 (1966); *Fitch v. Kentucky-Tennessee Light & Power Co.*, 136 F.2d 12, 15–16 (6th Cir. 1943). Thus, a defense based upon meeting competition, such as is available under Section 2(b) in Section 2(a) cases, is no defense in a Section 2(c) case. *Federal Trade Commission v. Washington Fish & Oyster Co.*, 271 F.2d 39, 44 (9th Cir. 1959). *See also Federal Trade Commission v. Simplicity Pattern Co., supra*, 360 U.S. at 65–67, 79 S.Ct. at 1011–12.

Despite the apparently broad reach of the Section 2(c) terminology "commission, brokerage, or other compensation", these words do not automatically act to prohibit all forms of negotiated price reduction. The words "or other compensation" are intimately related to the purpose of the section and should be construed to mean compensation in the nature of a commission or brokerage—in other words, compensation for placing or obtaining an order for the purchase or sale of goods. *See* Austin, *Price Discrimination and Related Problems under the Robinson-Patman Act* 104 (ALI–ABA, 2d ed. 1959).

Likewise, for a discount or allowance *in lieu* of "commission, brokerage, or other compensation" to be actionable under Section 2(c), it must be a substitute payment for that which the Act forbids. *See Federal Trade Commission v. Henry Broch & Co., supra*, 363 U.S. at 173–76, 80 S.Ct. at 1163–64; *Robinson v. Stanley Home Products, Inc.*, 272 F.2d 601, 603–04 (1st Cir. 1959). While proof of sale or purchase transactions with third parties is not required in order to establish a Section 2(c) violation, *see Jarrett v. Pittsburgh Plate Glass Co.*, 131 F.2d 674 (5th Cir. 1942), there must nonetheless be some evidence that the discount or allowance was in fact *in lieu* of a brokerage commission. No such evidence was present in this case.[5]

Contracts for construction work on projects of the type involved in this case are normally awarded on the basis of competitive bids. The general contractor, in developing its bid, solicits bids from potential subcontractors to determine the cost of the performance of various specialty work. If the general contractor is awarded the prime contract, it is then in a position to control its costs by accepting certain bids on its subcontracts. In this case, the jury found, and on appeal Ideal does not contest, that Zapata was under no legal obligation to accept Ideal's bid. Whatever might be said about Zapata's business practices in "shopping" Ideal's bid in order to obtain a lower figure from Benco, there is nothing in the record with respect to these negotiations which could even remotely be considered analogous to or "in lieu of" compensation for placing or obtaining an order for the purchase of "goods, wares, or merchandise".

---

**5.** The Supreme Court stressed in *Broch* the necessity to relate an alleged Section 2(c) violation directly to the brokerage function:

> This is not to say that every reduction in price, coupled with a reduction in brokerage, automatically compels the conclusion that an allowance "in lieu" of brokerage has been granted. As the Commission itself has made clear, whether such a reduction is tantamount to a discriminatory payment of brokerage depends on the circumstances of each case.

363 U.S. at 175–76, 80 S.Ct. at 1164.

Thus a price reduction to the buyer, when *equivalent in purpose and effect* to the illicit payment of a broker's fee *to the buyer,* may constitute an allowance or discount "in lieu of brokerage" within the scope of Section 2(c). If a discount "serves the same purpose, has the same effect, and enjoys no economic justification which entitles it to be distinguished, a . . . discount ought to be regarded as an allowance in lieu of a commission or brokerage— but not otherwise."

\* \* \* \* \* \*

Conversely, however, a lower price is *not* an allowance "in lieu of" brokerage if it is causally conceived in considerations *other* than a saved commission or fee.

Rowe, *Price Discrimination under the Robinson-Patman Act* 340–41 (1962) (footnote omitted; emphasis original). *See Empire Rayon Yarn Co. v. American Viscose Corp.,* 354 F.2d 182, 189 (2d Cir. 1965) (Moore, J., dissenting), *vacated and dissent adopted,* 364 F.2d 491 (2d Cir. 1966), *cert. denied,* 385 U.S. 1002, 87 S.Ct. 704, 17 L.Ed.2d 541 (1967); *In re Whitney & Co.,* 273 F.2d 211, 214–15 (9th Cir. 1959); *Robinson v. Stanley Home Products, Inc., supra,* 272 F.2d at 603–04.[6]

## II

Section 7 of the Arkansas Unfair Practices Act, Ark.Stat.Ann. § 70–307, provides in part:

The secret payment or allowance of rebates, refunds, commissions, or unearned discounts, whether in the form of money or otherwise, or secretly extending to certain purchasers special services or privileges not extended to all purchasers purchasing upon like terms and conditions, to the injury of a competitor and where such payment or allowance tends to destroy competition, is an unfair trade practice \* \* \* .[7]

---

**6.** Since the evidence was such that the District Court could hold as a matter of law that the price reduction extracted from Benco by Zapata was not compensation in lieu of brokerage, it is unnecessary to examine at length the District Court's alternative findings that (1) the contract was one for engineering and not for the sale of "goods, wares, or merchandise", and (2) services were rendered in exchange for the reduction, thus invoking the statutory exception contained in Section 2(c).

In *General Shale Products Corp. v. Struck Const. Co.,* 132 F.2d 425, 428 (6th Cir. 1942), the Sixth Circuit held that a construction contract involving a substantial sale of bricks was not a sale of "commodities" as required by Section 2(a). *Cf. Baum v. Investors Diversified Services, Inc.,* 409 F.2d 872 (7th Cir. 1969); *Tri-State Broadcasting Co. v. United Press International, Inc.,* 369 F.2d 268 (5th Cir. 1966). Other courts have likewise required in Section 2(c) actions that the underlying contract be for "goods, wares, or merchandise". *Rangen, Inc. v. Sterling Nelson & Sons, Inc.,* 351 F.2d 851, 861 (9th Cir. 1965), *cert. denied,* 383 U.S. 936, 86 S.Ct. 1067, 15 L.Ed.2d 853 (1966); *Stutzman Feed Service, Inc. v. Todd & Sargent, Inc.,* 336 F.Supp. 417, 419–20 (S.D. Iowa 1972). In *Stutzman,* the court held that whether or not a particular contract could be so classified was a question of fact.

It is also apparent that the terminology "goods, wares, or merchandise" in the statute may merely modify the "services rendered" exception and therefore constitute only an element to be determined when a defendant contends that the concession was made in exchange for "services rendered". *See Biddle Purchasing Co. v. Federal Trade Commission,* 96 F.2d 687, 691 (2d Cir.), *cert. denied,* 305 U.S. 634, 59 S.Ct. 101, 83 L.Ed. 407 (1938); H.R.Conf.Rep.No.2951, 74th Cong., 2d Sess. 7 (1936).

The District Court found that there was evidence that as a part of the agreement for a lower bid, Benco was relieved of the obligation to provide concrete inertia bases costed at $500 and to do boiler room construction work costed at $1,000. This would have been evidence from which a jury could have found that services had been rendered in connection with the price modification, but would not necessarily have been sufficient to justify setting aside a contrary verdict. Our holding rests upon no such tenuous assessment of the record; the absence of any evidence of brokerage or compensation in lieu of brokerage is dispositive of Ideal's Section 2(c) claim.

**7.** The Arkansas statute was adopted in 1937, shortly after the Robinson-Patman Act amendment of 1936, and was obviously designed to prohibit similar types of business conduct.

The District Court, after an analysis of Arkansas decisions, concluded that the Arkansas statute required proof "that the payment or allowance must tend to destroy competition." 382 F.Supp. at 1168. *See Concrete, Inc. v. Arkhola Sand & Gravel Co.*, 228 Ark. 1016, 1019, 311 S.W.2d 770, 772 (1958); *Baratti v. Koser Gin Co.*, 206 Ark. 813, 819–20, 177 S.W.2d 750, 753 (1944).[8] The interpretation of the District Court on this matter of state law is entitled to great deference. *See Carson v. National Bank of Commerce Trust and Savings*, 501 F.2d 1082, 1083 (8th Cir. 1974); *Luke v. American Family Mutual Insurance Co.*, 476 F.2d 1015, 1019 (8th Cir. 1973).

The District Court observed that the only evidence relating to competition was that Ideal "has increased its income, grown in size, and has bid and obtained larger contracts since the awarding of the subcontract by Zapata Warrior to Benco." 382 F.Supp. at 1168–69. It held that there was thus no evidence in the record of any adverse effect upon competition. The District Court further concluded that the challenged transaction did not involve the sale of a specific product or item, but was rather an attempt to reach "an agreed contract price" for the performance of engineering work indirectly involving and supplying some parts and equipment. Finally, it noted that there was nothing "secret" about the price reduction because it was fully reflected in the final subcontract.

We agree with the District Court's assessment of the record. Further, we do not think that the purpose of Section 7 of the Arkansas Unfair Practices Act was to regulate hard bargaining between a general contractor and its subcontractor, especially in the absence of any evidence of commercial bribery or secret payments given or extracted.[9]

### III

Finally, Ideal contends that the District Court erred in holding that, since there had been no breach of an existing contract and since many factors went into the selection of Benco rather than Ideal, the proof of damages was entirely speculative. *See Morning Pioneer, Inc. v. Bismarck Tribune Co.*, 493 F.2d 383, 387–88 (8th Cir. 1974). Because we uphold the District Court's entry of judgment notwithstanding the verdict on the grounds that there had been neither a Section 2(c) violation nor a violation of the Arkansas Unfair Practices Act, we do not reach the issue of damages.

The judgment of the District Court is affirmed.

---

8. In *Baratti v. Koser Gin Co.*, 206 Ark. 813, 819–20, 177 S.W.2d 750, 753 (1944), the Arkansas Supreme Court stated:

Before any agreement for a rebate can be said to violate the provisions of [Section 7], such rebate must: First, be secret; second, not be paid to all patrons upon like terms and conditions; and third, must tend to destroy competition.

9. Zapata asserts the additional defense that the Arkansas statute only prohibits *payment* of a secret allowance and not the receipt thereof. There is merit to this contention, but our holding does not require that we reach it.