The MORNING PIONEER, INC.,
Appellant,

v.

The BISMARCK TRIBUNE COMPANY,
a corporation, Appellee and
Cross Appellant.

Nos. 73-1036, 73-1049.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 11, 1973.

Decided March 12, 1974.

Bruce B. Bair, Mandan, N. D., for appellant.

Daniel J. Chapman, Bismarck, N. D., for appellee.

Before HEANEY, STEPHENSON and WEBSTER, Circuit Judges.

HEANEY, Circuit Judge.

This appeal arises out of a private antitrust suit between the publishers of two daily newspapers in southwestern North Dakota. The Morning Pioneer, Inc., publishes a morning paper, "The Morning Pioneer," in Mandan. Seven miles away in Bismarck, an evening paper, "The Bismarck Tribune," is published by The Bismarck Tribune Company.

For several years, there was very little competition for circulation or advertising between the newspapers in their respective hometowns.[1] Consequently, the Pioneer's Bismarck circulation was very limited as was the Tribune's Mandan circulation. The papers entered into agreements under which virtually all national and some local advertising was solicited jointly for publication in both papers, and the proceeds were distributed to reflect relative shares of the total circulation—seventy-five percent to the Tribune and twenty-five percent to the Pioneer. In 1963, the management of the Tribune shifted to an aggressive publisher, and a Bismarck family with a printing background—the Conrads—purchased the Pioneer. The previous noncompetitive atmosphere was replaced by aggressive competition. Each paper initiated measures to increase its circulation and advertising in the other's hometown.

In August, 1969, the Pioneer brought this action, seeking damages and injunctive relief. It alleged that the Tribune's practice of selling its carrier-delivered newspapers for a lesser price in Mandan and elsewhere[2] than in Bismarck constituted price discrimination in violation of § 2(a) of the Clayton Act as amended by the Robinson-Patman Act.[3] It also complained that the Tribune engaged in practices constituting an "attempt to monopolize" as prohibited by § 2 of the Sherman Anti-Trust Act[4] by: (1) attempting to purchase the Pioneer; (2) cancelling the joint advertising agreements; (3) hiring Pioneer employees; (4) granting certain advertisers rates more favorable than the published rates to encourage advertising in the Tribune rather than the Pioneer; (5) giving premiums to new subscribers; (6) selling the Tribune for a lesser price in Mandan than in Bismarck; and (7) blanketing Mandan homes with free copies of the Tribune on numerous occasions.

The District Court held that three periods of blanketing had been of sufficient intensity to constitute an "attempt to monopolize" in violation of the Sherman Act, but that the other practices, considered individually or collectively, did not constitute such an attempt. It further held that the Clayton Act had not been violated. It denied injunctive relief but awarded the Pioneer nominal single damages of one dollar (three dollars trebled) and attorney's fees of $7,350, plus costs for the Sherman Act violation.

---

1. The opinion of the District Court details the history of the newspapers' ownership and competitive practices. 342 F.Supp. 1138, 1139–1140 (D.N.D.1972).

2. At trial, the Pioneer limited its claim and proof of damages from price discrimination to that discrimination existing between Bismarck and Mandan.

3. That section provides:
 It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States * * * and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them : * * *
 15 U.S.C. § 13(a) (1970).

4. Section 2 of the Sherman Act, makes it unlawful to "attempt to monopolize * * * any part of the trade or commerce among the several states * * *." 15 U.S.C. § 2 (1970).

The Pioneer asserts on this appeal that the District Court erred in: (1) finding that the intensive blanketing during the three periods was the only Sherman Act violation; (2) awarding only nominal damages for this violation; (3) failing to find that the price difference violated the Clayton Act and not awarding damages for that violation. It asks this Court to assess substantial damages for the claimed violations or to remand to the District Court with instructions to it to determine damages for the violations, or to grant a new trial. No request for injunctive relief is made. The Tribune, on the other hand, asserts that the District Court erred in: (1) holding that the blanketing violated the Sherman Act; and (2) awarding excessive attorneys' fees for the violation. It asks that the court be affirmed except insofar as it found a violation of the Sherman Act and granted attorneys' fees to the Pioneer. It requests that these fees be disallowed or reduced.

## THE SHERMAN ACT VIOLATIONS

 To establish an "attempt to monopolize" in violation of § 2 of the Sherman Act, it is necessary to prove: (1) a specific intent to monopolize; (2) an overt act or acts; and (3) a dangerous probability of monopolization of a specific product market in a particular geographic market. *See*, Acme Precision Products, Inc. v. American Alloys Corp., 484 F.2d 1237, 1240 (8th Cir. 1973); Agrashell, Inc. v. Hammons Products Company, 479 F.2d 269, 284–286 (8th Cir.), cert. denied 414 U.S. 1022, 94 S.Ct.

445, 38 L.Ed.2d 313 (1973). *See also*, Hibner, Attempts to Monopolize: A Concept in Search of Analysis, 34 ABA Antitrust L.J. 165 (1967); Smith, Attempt to Monopolize: Its Elements and Their Definition, 27 Geo.Wash.L.Rev. 227 (1959).

The court properly found that each of the necessary elements was present here. The Tribune was the dominant daily newspaper in southwestern North Dakota. If it succeeded in driving the Pioneer out of business, a dangerous probability existed that it would achieve a monopolistic position in the daily newspaper market and would be able to exploit that position to the disadvantage of the people and businesses in the area. The fact that television and radio would continue to compete in the news and advertising field would not prevent the Tribune from exploiting its position as the only daily newspaper because electronic media is not wholly competitive with respect to some types of news and advertising.[5] These include: in depth stories on local and national affairs; detailed stories on births, deaths, marriages and social engagements; stock market statistics; detailed sports stories; and price advertising, particularly in the grocery field.

The intent to monopolize was adequately shown by the Tribune's distribution of thousands of free newspapers to Mandan housing units during April and May and September and October of 1963, and during January through March of 1965.[6] Much of the blanketing during these periods was done on

---

5. *See*, United States v. Times Mirror Company, 274 F.Supp. 606, 618 (C.D.Cal.1967), aff'd mem., 390 U.S. 712, 88 S.Ct. 1411, 20 L.Ed.2d 252 (1968); Roberts, Antitrust Problems in the Newspaper Industry, 82 Harv.L.Rev. 319, 320–322 (1968). *See also*, United States v. Grinnell Corp., 384 U.S. 563, 572, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966), where the Supreme Court sanctioned the recognition of submarkets for antitrust purposes.

6. The blanketing in April and May of 1963 began on the same day as the commencement of the publication of the Pioneer by its

new owners, the Conrads. It continued daily for three weeks; and on each day, between 1,600 and 2,000 papers were distributed. The blanketing in September and October was continuous for one week; and for the balance of the two-month period, it was done each week on Wednesday. On most of these days, 1,500 copies of the Tribune were distributed. Finally, during January of 1965, blanketing took place on eight occasions and between 1,000 and 2,400 copies were distributed on each day. This was followed by blanketing of similar intensity on eight days in February and on seven days in March of 1965.

Wednesday, the heavy grocery ad days. It was sometimes accompanied by an appeal to Mandan grocery advertisers to place ads on those days. Because advertising constituted eighty percent of the Pioneer's revenue and a significant portion of that revenue came from grocery advertising, the dangerous probability that the Pioneer would be driven out of business by a continuation of the practice is evident. *Accord*, Kansas City Star Company v. United States, 240 F.2d 643, 662 (8th Cir.), cert. denied, 354 U. S. 923, 77 S.Ct. 1381, 1 L.Ed.2d 1438 (1957). The blanketing condemned by the court clearly exceeded that permissible in furtherance of a legitimate attempt by the Tribune to enter the Mandan market and properly served as a basis for the court's implicit finding of an intent to monopolize by the Tribune.

■ The Pioneer would have us go a step further and find that the District Court erred in failing to find that other acts also were illegal attempts to monopolize. We decline to do so. There is adequate evidence in the record to support the court's findings that: the cancellation of the joint advertising agreement served to terminate an anti-competitive agreement; that the Tribune did not act improperly in hiring former employees of the Pioneer; that the premium giveaway programs engaged in by the Tribune were reasonable and done in accordance with accepted practices in the newspaper industry; and that no improper advertising rate discrimination occurred.

■ The Pioneer would also have us reverse the court's implicit holding that the Tribune's practice of charging a lower price in Mandan was not violative of the Sherman Act. We reject the invitation. That holding is supported by the evidence demonstrating that the pricing practice was one of over thirty years standing.

■ Finally, the Pioneer urges that the District Court erred by not viewing all of the acts of the Tribune together in determining whether there was an attempt to monopolize. The Pioneer is correct in asserting that the trier of fact must adopt that approach, *see*, Sanitary Milk Producers v. Bergjans Farm Dairy, Inc., 368 F.2d 679, 691 (8th Cir. 1966), but the Pioneer is mistaken in its assertion that the court failed to do so. After considering each act individually, the court stated that it was required to view "the evidence as a whole and * * * not tightly compartmentalize the various components, and wipe the slate clean after scrutiny of each." It then stated:

* * * Nevertheless, I find that the conduct of the Bismarck Tribune, whether considered in its separate parts or as a whole, did not constitute an act in restraint of trade.[7] I reiterate that both papers, following March of 1962, responded to the termination of a non-competitive agreement with aggressive, but reasonably competitive conduct, except for the blanketing perviously discussed. 342 F.Supp. at 1142.

## DAMAGES FOR THE SHERMAN ACT VIOLATION

■ Any person injured in his business or property by reason of another's violation of the antitrust laws may recover treble damages from the wrongdoer. 15 U.S.C. § 15. But it is not enough for recovery of damages to prove that an antitrust law was violated by the defendant. *Cf.*, Duff v. Kansas City Star Company, 299 F.2d 320, 323 (8th Cir. 1962). Rather, the rule is that damages may not be awarded to a litigant unless he also proves "with a fair degree of certainty, the fact of damage and the causal connection between the antitrust violation and the injury." ABA Antitrust Section, Antitrust Devel-

---

7. We are convinced that the court misstated when it used the term "restraint of trade" here. We are satisfied that the court meant to use the term "attempt to monopolize," as that was the question before the court.

opments: 1955–1968, at 282 (1968). *See*, Atlas Building Prod. Co. v. Diamond Block & Gravel Co., 269 F.2d 950, 957–958 (10th Cir. 1959), cert. denied, 363 U.S. 843, 80 S.Ct. 1608, 4 L.Ed.2d 1727 (1960). *Cf.*, Perkins v. Standard Oil Co., 395 U.S. 642, 648, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969); Story Parchment Co. v. Paterson P. Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931).

■ The Pioneer's claims for damages for the Sherman Act violation were premised on two factors—loss of advertising revenue and loss of circulation. The District Court found that Pioneer lost one-third of its grocery advertising during a five-week period in 1965, that this was the only advertising loss, and that it was caused by the illegal blanketing in 1965. It declined to award more than nominal damages for the loss because no evidence was introduced to show what the advertising revenue actually was or would have been absent the blanketing. We are satisfied that the court's findings and conclusions with respect to the loss of advertising revenue are supported by substantial evidence. This is not an instance where the defendant's actions prevented a precise computation of the damage. Rather, the fault lies in the plaintiff's failure to introduce any evidence as to the value of its grocery advertisements, normal or actual, during the five-week period. The plaintiff's witness merely related that the loss was one-third of the normal. To have awarded more than nominal damages under these circumstances would have been to engage in impermissible speculation and conjecture. *See, e. g.*, Siegfried v. Kansas City Star Company, 298 F.2d 1, 5–8 (8th Cir.), cert. denied, 369 U.S. 819, 82 S.Ct. 831, 7 L.Ed. 2d 785 (1962).

■ The court properly declined to award damages for loss of circulation. While there was evidence in the record to support a finding that Pioneer lost three hundred paid subscribers between 1963 and 1964,[8] the court's finding that it was impossible to determine that the loss in subscription was caused by the Tribune's wrongdoing was not clearly erroneous. The reduction, as the court indicated, could have been caused by one or more of the following facts: (1) the Pioneer was changed from an evening to a morning paper on May 19, 1963; (2) the arrangement between the Pioneer and the Tribune owners of not competing in the other's hometown was also curtailed in 1963; (3) the Pioneer, especially its circulation department, was poorly managed; and (4) the Pioneer's editorial policy was shifted to a more liberal position by the Conrads. The Pioneer made an attempt to prove that these factors did not cause the reduction, but its proof did not satisfy the District Court. We cannot say that the court erred in concluding that the proof of causation was inadequate.

## THE CLAYTON ACT ISSUES

The District Court found that for over thirty years, the Tribune, by carrier, was sold for a lower price in Man-

---

8. The court stated that the Pioneer's circulation records were so questionable and unreliable that it would have been improper to find a loss in circulation by relying on them. While this fact precluded the court from estimating the Pioneer's circulation after March 31, 1966, it could have determined the paper's circulation with the necessary degree of certainty prior to that date by relying on the reports of the Audit Bureau of Circulations (ABC).

The ABC report for the nine-month period ending March 31, 1963, shows an adjusted figure for "Carrier and Dealer" circulation of the Pioneer in Mandan to be approximately 2,250, while the same adjusted figure for the twelve-month period ending March 31, 1964, is about 1,925. In reaching these figures, we assumed that the adjustments made were attributable to the "Carrier and Dealer" category rather than the "Mail" category as the latter appeared to have less variation during the years in question. This Mandan reduction of approximately three hundred continued through March 31, 1966, when the Pioneer's last audited report by the ABC was prepared. After that date, the Pioneer terminated its affiliation with the ABC.

dan than in Bismarck.[9] It held that this practice did not violate § 2(a) of the Clayton Act for two reasons: (1) The Tribunes delivered in the two cities were not of "like grade and quality" as the Tribune had a lesser value to Mandan readers than Bismarck readers. (The court reasoned that the paper arrived later in Bismarck, contained little Mandan news, and less advertising of interest to Mandan readers.) (2) The effect of the price discrimination was not "substantially to lessen competition or tend to create a monopoly."

We need not decide whether the court erred in concluding that the Tribune did not violate § 2(a) of the Clayton Act by its price discrimination practice.[10] Even if we resolved all the Clayton Act liability contentions in the Pioneer's favor—i. e., that newspapers are "commodities" subject to the Act,[11] that the Tribunes delivered in Mandan and Bismarck were of "like grade and quality"[12] and that the price discrimination had the prohibited effect on competition[13]—a reversal and remand of this case to the District Court would be unnecessary. This is true because the Pioneer failed to prove that it was injured by the Tribune's price discrimination.

9. The record reveals that during this period, the Mandan price was five cents per week less than the Bismarck price. The practice of charging less for carrier-delivered Tribunes in Mandan was curtailed on October 26, 1970, but a differential was continued in other communities. Except for the period of September 1966–September 1967, the price of the Tribune by carrier in Mandan was less than or equal to the price of the Pioneer by carrier in Mandan. The higher Pioneer price in the period of exception resulted from an increase in the Pioneer's price, and the difference was five cents per week.

10. The parties agree that "price discrimination" between different purchasers was proven. See Federal Trade Com. v. Anheuser-Busch, 363 U.S. 536, 549, 80 S.Ct. 1267, 4 L.Ed.2d 1385 (1960), where the Supreme Court held "a price discrimination within the meaning of [§ 2(a)] is merely a price difference." They also agree, as they had stipulated at trial, that the interstate commerce requirements of the antitrust laws were met in this case. While we are satisfied that there was sufficient connection with interstate commerce under the Sherman Act, there is doubt as to whether third commerce requirements of § 2(a) of the Clayton Act, was met—i. e., that "either or any of the purchases involved in such discrimination [were] in commerce." 15 U.S.C. § 13(a). See, e. g., Stickells, Federal Control of Business-Antitrust Laws § 126 (1972); Rowe, Discriminatory Sales of Commodities in Commerce: Jurisdictional Criteria Under the Robinson-Patman Act, 67 Yale L.J. 1155, 1166–1168 (1958). See also, Littlejohn v. Shell Oil Company, 483 F.2d 1140 (5th Cir.) (en banc), cert. denied, 414 U.S. 1116, 94 S.Ct. 849, 38 L.Ed.2d 743 (1973). Nonetheless, we decline to examine this question any further because it was not raised by the parties and its resolution either way would not affect our disposition of the appeal.

11. The term "commodity" is not defined in the Act, but it is generally thought to include only tangible items of commerce and not services. See, Tri-State Broadcasting Co. v. United Press Internat'l, Inc., 369 F.2d 268, 270 n. 2 (5th Cir. 1966). See also, Stickells, Federal Control of Business-Antitrust Laws § 129, at 449–450 (1972); Rowe, Discriminatory Sales of Commodities in Commerce: Jurisdictional Criteria Under the Robinson-Patman Act, 67 Yale L.J., supra at 1163–1165. We recognize that the production of a newspaper requires and incorporates the services of a great number of people, but the fact remains that when finally published, the paper takes on a tangible form and it is bought and sold in the market place. As such, it is predominantly a tangible good and, thus, a "commodity" subject to the Act.

12. In reaching its decision as to "like grade and quality," the court appears to have applied the "market acceptance" standard. While that standard is not without support among the commentators, see, e. g., Cassady & Grether, The Proper Interpretation of "like Grade and Quality" Within the Meaning of Section 2(a) of the Robinson-Patman Act, 30 S.Cal.L.Rev. 241 (1957), it was rejected by the Supreme Court in Federal Trade Com. v. Borden Co., 383 U.S. 637, 640–641, 86 S.Ct. 1092, 16 L.Ed.2d 153 (1966). There, the Court indicated the proper test is that of "physical comparison."

13. The court appears to have required that the Pioneer prove the Tribune's price discrimination in fact had the prohibited effect on competition. Such a burden is not required under the statute. It is only neces-

The basic injury alleged to have been caused by the price discrimination was a loss in the Pioneer's Mandan circulation, and proof that this loss was caused by the price discrimination was properly found by the District Court to be wholly inadequate.[14] We also note that the price discrimination complained of was terminated in October 1970, and there is no showing or contention that it is likely to be reinstituted.

## ATTORNEYS' FEES

The award of attorneys' fees to successful plaintiffs is sanctioned by 15 U.S.C. § 15. Where no factual error is claimed, the amount assessed by the District Court must stand unless the party seeking review establishes that the court has abused its discretion. Armco Steel Corporation v. State of North Dakota, 376 F.2d 206, 212 (8th Cir. 1967). When the damages recovered are relatively small, as is the case here, it is not necessarily an abuse of discretion to grant attorneys' fees in excess of the damage award. Advance Business Systems & Supply Co. v. SCM Corporation, 415 F.2d 55, 70 (4th Cir. 1969), cert. denied, 397 U.S. 920, 90 S.Ct. 928, 25 L. Ed.2d 101 (1970). In arriving at the fee, the court considered the proper

factors,[15] and we find no abuse of discretion here.

We deny the Pioneer's request for attorneys' fees on this appeal.

Each party will bear its own costs on this appeal.

Affirmed.

sary for the plaintiff to prove there is a *"reasonable possibility"* that the price discrimination *may* have the prohibited effect on competition. Federal Trade Com. v. Morton Salt Co., 334 U.S. 37, 47, 68 S.Ct. 822, 92 L.Ed. 1196 (1948). *See,* Utah Pie Co. v. Continental Baking Co., 386 U.S. 685, 701, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967) ; Atlas Building Prod. Co. v. Diamond Block & Gravel Co., 269 F.2d 950, 957 (10th Cir. 1959), cert. denied, 363 U.S. 843, 80 S.Ct. 1608, 4 L.Ed.2d 1727 (1960). *But see,* Federal Trade Com. v. Morton Salt Co., *supra,* 334 U.S. at 55–61, 68 S.Ct. 822 (Jackson & Frankfurter, J.J., dissenting) and Moog Industries v. Federal Trade Commission, 238 F.2d 43, 61 (8th Cir. 1956), where the standard of *"reasonable probability"* was advanced.

14. The theory that the price discrimination caused the loss in the Pioneer's Mandan circulation is weakened by the evidence showing that the Tribune's Mandan circulation remained stable after it terminated the price

differential in October of 1970. The ABC's report for the twelve-month period ending March 31, 1970, reveals that the Tribune's Mandan "Carrier and Dealer" circulation was then 1,811, while the ABC's report for the twelve-month period ending March 31, 1971, shows the circulation increased to 1,895.

15. The court indicated it was considering the following factors in determining the award of attorneys' fees: (1) the fact that plaintiff's counsel had not had the benefit of a prior judgment or decree in a case brought by the government; (2) the standing at the bar of counsel on both sides; (3) the time spent by plaintiff's counsel; (4) the magnitude and complexity of the litigation; (5) the responsibility undertaken by counsel; (6) the amount recovered; and (7) the court's knowledge of the quality of counsel's work done on the case in and out of court. *See generally,* Comment, Attorneys' Fees in Individual and Class Action Antitrust Litigation, 60 Calif.L.Rev. 1656 (1972).