**ROD BAXTER IMPORTS, INC., a Minnesota Corporation, Plaintiff,**

v.

**SAAB–SCANIA OF AMERICA, INC., a Connecticut Corporation, Defendant.**

**Civil–4–78–9.**

United States District Court, D. Minnesota, Fourth Division.

May 21, 1980.

Stanford Robins, Deborah J. Palmer, Robins, Davis & Lyons, Minneapolis, Minn., for plaintiff.

Bruce E. Hanson, Doherty, Rumble & Butler, St. Paul, Minn., and William J. Doyle and Jeremy G. Zimmerman, Wiggin & Dana, New Haven, Conn., for defendant.

## MEMORANDUM AND ORDER

DEVITT, Chief Judge.

This is a dispute between an automobile dealer and its distributor. Plaintiff owned

a Saab automobile dealership from 1973 until late 1976, located in St. Paul, Minnesota. Defendant, Saab-Scania of America, Inc., a Connecticut corporation, is the United States distributor for Saab automobiles. This case was tried to the court from May 5 through May 9, 1980. Two essentially unrelated disputes were litigated: 1) an alleged misrepresentation made by defendant in 1975; and 2) a sales incentive program for Saab dealers established by defendant in 1976, which allegedly violated the Robinson-Patman Act. These two claims are discussed separately below, and both are found in favor of defendant.

## 1. *The Misrepresentation Claim*

The evidence adduced at trial established the following facts with respect to plaintiff's misrepresentation claim. Plaintiff in late July or early August of 1975 was contacted by Mr. Robert Evangelista, defendant's sales manager for Minnesota and the surrounding area. Mr. Evangelista advised plaintiff that certain types of Saab cars—principally two and four door manual transmissions—likely would be in short supply for the last several months of 1975. This information was verified by bulletins sent to plaintiff by defendant. As a result of these communications, plaintiff ordered 54 automobiles, primarily of the two and four door manual transmission variety, in early to mid-August of 1975, to ensure that it had an adequate inventory for the last months of the year. These automobiles arrived in September 1975, and plaintiff incurred ordinary overhead expenses for carrying those automobiles until they were sold during the latter months of 1975. Plaintiff made ordinary profits, exceeding expenses, as a result of those sales.

■ Plaintiff's claim of misrepresentation is based on the theory that, absent defendant's representations, plaintiff would have purchased most of the 54 cars later in the year, thus incurring less carrying costs. Assuming that plaintiff's theory of dam-

ages is sound, and assuming that defendant's representations were statements of present fact rather than merely predictions of probable future conditions, plaintiff nonetheless has failed to meet its burden of proof, for the simple reason that the representations were not false. The evidence establishes beyond peradventure that 1975 model two and four door manual transmission Saabs were in short supply at least after September 18, 1975. Indeed, apparently during most of the last four months of 1975 such automobiles were not available at all to dealers from defendant.

■ It is elementary that under Minnesota law, as is true elsewhere, one essential element of a fraud or misrepresentation claim is that the statement or representation of the defendant must be untrue. *See, e. g., Hanson v. Ford Motor Co.*, 278 F.2d 586, 591 (8th Cir. 1960) (applying Minnesota law). Plaintiff simply has not established this element in the present case; the only evidence of falsehood was speculative and based principally upon second-hand information, and it was overwhelmingly rebutted by competent evidence that the statements were accurate.[1] Therefore, the court finds for the defendant on the misrepresentation count.

## 2. *The Robinson-Patman Act Claim*

Count two is based on the Robinson-Patman Act, 15 U.S.C. § 13(a) (1976), charging price discrimination. The facts with respect to this count are as follows. Defendant frequently during 1975 and 1976 established incentive-bonus programs for its Saab dealers. Plaintiff partook in and profited from many of these programs. However, plaintiff did not benefit from one such program—the "Saab Summer Sell-a-Bration" in 1976. It is about this promotional program that plaintiff complains.

The "Sell-a-Bration" incentive program lasted for the three month period of July through September 1976 and participation

---

1. Plaintiff's manager, Mr. Dean, for example, even admitted that Mr. Evangelista's state-   ments were not false.

was open to all Saab dealers. Under the program each dealership was assigned a quota, based on its performance during an earlier three month period—March through May of 1976. If the dealership during July–September of 1976 exceeded its quota by 120%, it received a bonus of $200 for each eligible car sold, including cars sold to reach the quota. Similarly, if the dealership exceeded its quota by 130% or 140%, it received a bonus of $300 or $400, respectively, for each eligible car sold. Furthermore, during the last two months of the incentive program, August and September of 1976, defendant allowed all its dealers to count each sale as two sales for purposes of reaching their quotas and the bonus percentages above the quotas, thus making it substantially easier for dealers to reach the bonus levels.

Plaintiff's quota for the Sell-a-Bration program was set at 60 cars, representing the number of Saabs plaintiff had sold during March through May of 1976. Thus, to obtain the maximum bonus of $400 per automobile plaintiff had to sell 84 Saabs, 140% of 60. Given the 2-for-1 feature available in August and September, plaintiff would have had to have averaged about 17 sales per month to reach the maximum bonus level.

The essence of plaintiff's complaint with respect to the Sell-a-Bration program is that its quota was set unfairly high in relation to other dealers with which it competed. Although the quotas for all dealers were based on their performances during March–May 1976, plaintiff argues that its performance during that three month period was not representative of its normal performance, thus resulting in it being assigned an unreasonably high quota. Thus, argues plaintiff, competing dealers were able to use their bonuses, which they could receive more readily than plaintiff, to reduce the resale price of their Saab cars, thereby underselling plaintiff.

Plaintiff's Robinson-Patman Act claim is based on 15 U.S.C. § 13(a), a so-called § 2(a) claim. *Compare, e. g., Century Hardware Corp. v. Acme United Corp.*, 467 F.Supp. 350 (E.D.Wis.1979). To establish a prima facie § 2(a) case the plaintiff must prove: (1) the seller, defendant, charged two or more of its customers different prices for the same goods; (2) the favored customers were in competition with the disfavored ones; (3) there is a reasonable possibility that the price discrimination may have the effect of substantially lessening competition; and (4) the price discrimination actually caused the damages complained of by plaintiff. *See Zwicker v. J. I. Case Co.*, 596 F.2d 305, 308–09 (8th Cir. 1979); *Morning Pioneer, Inc. v. Bismark Tribune Co.*, 493 F.2d 383, 389–90 & nn. 13–14 (8th Cir. 1974).

The evidence presented at trial does not establish a prima facie § 2(a) price discrimination case. The first two requirements—that competing buyers must be charged different prices for the same product—probably have been established by the plaintiff. The evidence, although conflicting, shows that plaintiff competed with at least three other Saab dealers: Countryside in St. Paul, Morrie's in Wayzata, and Adams' in Albert Lea. Two of these competitors, Morrie's and Adams', met their respective quotas and received bonuses as a result of the Sell-a-Bration promotion. In a narrow sense, therefore, these two competitors paid less for Saabs bought from defendant during July–September 1976 than did plaintiff.[2]

The final two requirements, however, have not been established. To satisfy the third requirement plaintiff must prove that the effect of the price differences may have been to substantially lessen competition. There has been considerable debate between the parties as to the relevance of a

2. In a broader sense, however, the requirement of price discrimination has not been met. If the bonuses were available to all competitors on the same terms, then the bonuses would not be discriminatory, even if some dealers chose not to make the commitment necessary to obtain the bonuses. This court determines *infra*, that the bonuses were available to all dealers on the same terms.

closely analogous Fifth Circuit case, *Chrysler Credit Corp. v. J. Truett Payne, Inc.*, 607 F.2d 1133 (5th Cir. 1980), with respect to this third requirement. The court is satisfied that the proper standard is that stated in the Eighth Circuit *Morning Pioneer* case, *supra*: that "it is only necessary for the plaintiff to prove there is a 'reasonable possibility' that the price discrimination may have the prohibited effect on competition." 493 F.2d at 389–90 n.13.

■ Even applying the *Morning Pioneer* standard, however, the plaintiff cannot prevail. The parties appear to agree that if the Sell-a-Bration incentive program was available to all competing dealers on reasonably equivalent terms, then there would not be a reasonable possibility that the program may have had the effect of substantially limiting competition. In other words, if the program was a fair one, it would not likely have had the effect of limiting competition, but in fact would likely have fostered competition. Therefore, the central inquiry is whether the bonus payments under the Sell-a-Bration program were available to all competing dealers on essentially the same terms. *Compare, e. g., Century Hardware Corp. v. Acme United Corp.*, 467 F.Supp. 350, 354 (E.D.Wis.1979); *Mowery v. Standard Oil Co. of Ohio*, 463 F.Supp. 762, 776 n. 17 (N.D.Ohio 1976), *aff'd without opinion*, 590 F.2d 335 (6th Cir. 1978).

The facts show the answer to this central inquiry to be affirmative: the bonus payments were available to all competing dealers on essentially the same terms. Plaintiff has attempted to show that the Sell-a-Bration program was unfair because the quotas were based on too short a period of time, which in the volatile foreign car market necessarily will result in quotas that are not representative of likely dealer performances during subsequent periods. Rather, argues plaintiff, a one or two year base period should have been used to compute the quotas.

The court cannot agree with plaintiff's argument. The trial evidence indicates the use of a three month base period for computing the quotas was not unfair. The same period was used for all dealers, and the period chosen was the three months immediately preceding the incentive program. The use of a three month period may not in particular instances reflect long term trends for a particular dealer. But at the same time the use of a longer period may not reflect recent trends of dealers. In this particular case the court is not persuaded that the quotas were unfair. The use of the three month period of March–May 1976 resulted in plaintiff being assigned a quota of 60 cars, or 20 per month. This 20 car figure is the same as plaintiff's actual average monthly sales during all of the preceding year, 1975. And it is less than plaintiff's own contemporaneous projections of likely sales during 1976.

The evidence presented by plaintiff tending to indicate that some dealers would have been better or worse off if a longer base period was used, does not in the court's view establish that the program was unfair or that it may have had the effect of substantially limiting competition. This is especially so in light of the 2-for-1 feature in effect for the last two months of the program. This feature, combined with the uniform base period and bonus percentages, made the program a fair one and made the bonuses available on a reasonably equivalent basis to all dealers who made the commitment to obtain them. The fact that some dealers reached their quotas while others did not appears to be the result of factors other than the Sell-a-Bration program, such as low inventory, poor financing, reduced sales forces, and poor management. Based on these considerations, the Sell-a-Bration sales incentive program cannot reasonably be viewed as a price discrimination program that may have had the effect of substantially limiting competition.[3]

---

**3.** Plaintiff presented a surprise rebuttal witness, Mr. Brian Bedell, prior to the close of defendant's case, to testify principally as to this third requirement. Defendant objected to this testimony, because of surprise. The court has considered the testimony but has not found it sufficiently weighty to change the result.

■ The final requirement for a prima facie case also has not been met. To prevail plaintiff must prove that it suffered damages and that those damages were caused by defendant's violations of the Robinson-Patman Act. *See, e. g., Morning Pioneer, supra,* at 389–90 & n. 14; *American Can Co. v. Russelville Canning Co.,* 191 F.2d 38, 54 (8th Cir. 1951). Plaintiff's principal claim of damages is that its sales dropped during the period the Sell-a-Bration promotion was in effect. The evidence, however, clearly shows that the drop in sales during the summer of 1976 was the result of factors unrelated to the Sell-a-Bration promotion. The owner of plaintiff, Rod Baxter, began to negotiate for the sale of the dealership in early 1976, which undoubtedly was reflective of his overall interest in the management of the business in 1976. The inventory at plaintiff's dealership declined steadily throughout 1976, starting even before the Sell-a-Bration program was announced and reaching the level of three cars in July and eight in August, substantially less than needed for effective selling. Plaintiff's ability to increase its inventory was limited by its inability to obtain financing, since Rod Baxter's line of credit had been exhausted by his separate car leasing company. Moreover, plaintiff's sales force dropped from four to three, and then apparently down to two, during the summer months of 1976, further limiting its ability to make sales.

In general, therefore, it is quite clear from the evidence that the drop in sales during the summer of 1976 was the natural consequence of Rod Baxter's decision to wind down the activities of the dealership prior to its eventual sale in late 1976. Therefore, the damages claimed by plaintiff, even if actually suffered, were not the result in whole or in part of defendant's Sell-a-Bration program.

The clerk is directed to enter judgment in favor of DEFENDANT. This memorandum and order shall constitute the court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).