505 F.Supp. 525 (1980)
ROSEBROUGH MONUMENT COMPANY, Plaintiff,
v.
MEMORIAL PARK CEMETERY ASSOCIATION et al., Defendants.
No. 77-883C(1).
United States District Court, E. D. Missouri, E. D.
September 15, 1980.
*526 Bernard L. Mellman, James L. Zemelman, Charles Alan Seigel, Stein & Seigel, St. Louis, Mo., for plaintiff.
Veryl L. Riddle and John J. Hennelly, Jr., Bryan, Cave, McPheeters & McRoberts, James E. Crowe, Crowe, Schneider & Gioia, Ward, Fickie, Biggs, Casserly, Barnes, Fickie & Wolf, Robert S. Allen, Lewis, Rice, Tucker, Allen & Chubb, Dennis E. O'Connell, St. Louis, Mo., William Human, Ziercher, Hocker, Tzinberg, Human & Michenfelder, Clayton, Mo., W. Donald Dubail, Dubail, Judge, Kilker & Maier, St. Louis, Mo., for defendants.

MEMORANDUM
WANGELIN, Chief Judge.
This matter is before the Court for a decision on the merits following a ten day bench trial held in September of 1979.
Plaintiff brings this action pursuant to Sections 3, 4 and 16 of the Clayton Act, 15 U.S.C. §§ 14, 15 and 26, and Sections 1-3 of the Sherman Act, 15 U.S.C. §§ 1, 2, 3 seeking treble damages and injunctive relief for defendants' alleged violations of those sections by conspiring to engage and engaging in tie-in arrangements, by fixing prices, and by conspiring to monopolize and monopolizing the sale, manufacture, maintenance and installation of gravemarkers in the St. Louis metropolitan area.
After consideration of the testimony adduced at trial, the exhibits introduced in evidence, the briefs of the parties, and the applicable law, the Court hereby makes and enters the following findings of fact and conclusions of law. Any finding of fact equally applicable as a conclusion of law is hereby adopted as such and, conversely, any conclusion of law applicable as a finding of fact is adopted as such.

Findings of Fact
1. Plaintiff Rosebrough Monument Company is a privately held Missouri corporation in good standing with its principal place of business in St. Louis, Missouri which manufactures and sells monuments and markers and performs certain services in connection therewith in the St. Louis metropolitan area.
2. Each defendant is a Missouri corporation which now owns and operates a cemetery in the St. Louis metropolitan area. The defendants and the cemeteries they operate are:

 Defendant Name of Cemetery
Memorial Park Cemetery Association Memorial Park Cemetery
Valhalla Cemetery, Crematory Valhalla Cemetery, Crematory
& Mausoleum Company & Mausoleum Company
Lake Charles Memorial Park, Lake Charles Memorial Park
Inc.
W. J. Investment Company Mount Lebanon Cemetery,
 Crematory and Mausoleum
Lakewood Park Cemetery, Inc. Lakewood Park Cemetery, Inc.
Sunset Burial Park, Inc. Sunset Burial Park & Mausoleum
Stanza & Company Oak Grove Cemetery
Laurel Hill Memorial Gardens, Laurel Hill Memorial Gardens
Inc.
Mason Securities Company Hiram Cemetery
Mount Hope Cemetery & Mount Hope Cemetery &
Mausoleum Co. Mausoleum
Southern Securities Company Park Lawn Cemetery

3. There are about fifty cemeteries located in St. Louis City and County. With the exception of a few country cemeteries, all of them, including the defendants, have a rule (hereinafter referred to as "the Rule") which provides that the cemetery will perform the interment service and will prepare the foundation for any memorial placed on a gravesite in that cemetery. The cemetery imposes a charge for these *527 services and all grave spaces are sold subject to the Rule. The Rule has been in effect since the cemeteries began operating. The Rule does not require that a memorial be placed, thus there is no absolute requirement that foundation services be performed by the cemetery.
4. Since 1972, there have been approximately 15,000 deaths each year reported in St. Louis City and St. Louis County. Of the defendant cemeteries, Sunset usually had the highest number of interments; in 1978 it had 628 or about 4.5% of the reported deaths, while in that year Hiram was the lowest with only 110 interments, about .9% of the reported deaths. In 1978, all defendants together buried less than 22% of the total number of persons who died in St. Louis City and County.
5. There are about 6 or 7 non-cemetery monument dealers in the area which sell memorials (monuments and markers) to relatives of deceased persons who are buried in a cemetery in the area. Plaintiff is the largest and has two offices, one in the northern part of St. Louis and the other in the southern part of St. Louis. Both offices display memorials and both are located near large cemeteries. Sales persons located at each office solicit business from death notices or other leads whereby plaintiff gets notice of a recent death or burial in the area.
6. Each defendant operates an endowment type, fully managed cemetery. Each sells cemetery grave spaces in its own cemetery thereby granting the owner a right of interment for which the cemetery renders a charge, and the right to place a memorial on the gravesite for which the cemetery also renders a charge. The cemetery not only agrees to perform these services, but also agrees to maintain the cemetery properly in perpetuity. By statute the cemetery is required to have a perpetual care fund, to assure the performance of the maintenance obligation with a minimum payment of at least 10% of the purchase price of each grave space sold being paid into a separately managed irrevocable trust. Five of the defendant cemeteries also have memorial care funds and a portion of the cemetery's charge for memorial foundations is paid into a trust.
7. Each of the defendant cemeteries sells markers, and some sell monuments, for installation in its own cemetery. Each defendant's memorial sales are only for placement in its own cemetery and the cemetery thus competes with plaintiff and all other monument dealers in the area for such sales in its own cemetery. None of the defendant cemeteries require persons who own a grave space in their respective cemetery to buy a memorial from them and plaintiff sells memorials which are installed on gravesites in each defendant's cemetery. It is apparent from the testimony adduced herein that an uncertain number of purchasers elect not to purchase a permanent monument or marker.
8. The defendant cemeteries sell grave spaces "pre-need" (before a death) or "at-need" (at death). In connection with these sales the buyer may elect to purchase a memorial from the cemetery. In the case of a pre-need sale of a grave space and memorial, the installation will normally be deferred until interment. In other cases only the lot is purchased and the decision on the memorial is deferred and is made at-need.
9. When plaintiff or any other non-cemetery monument dealer sells a memorial to a lot owner in one of the defendant cemeteries (or in a non-defendant cemetery in this market area other than the few country cemeteries without work crews), it arranges with the cemetery to prepare the foundation. Plaintiff then delivers the memorial to the cemetery which has prepared the foundation and the memorial is then "set" on the foundation. Plaintiff is allowed to set memorials in some of the defendant cemeteries.
10. Each cemetery has its own procedure for preparing a foundation which in its judgment represents the best way to install the particular type of memorial in its particular cemetery. The various steps involved in handling the order, locating the site, scheduling and performing the foundation *528 work and setting and resetting of memorials in the defendant cemeteries requires the cemetery to use its clerical and outside employees, foundation materials and equipment. The cemetery's work crew and equipment are also used to perform the cemetery's interment and maintenance services. For various reasons, (e. g., unusual soil or weather conditions, improper foundation workmanship, improper specifications, improper maintenance, defective materials) difficulties may arise with previously performed foundation work. Resetting work is more or less constant in the cemeteries, ranging from approximately 50 to 150 resettings per year, depending on the cemetery.
11. Though charges for foundation services varied among the cemeteries their billing processes were similar. When the grave space owner buys a memorial from the cemetery the buyer is billed by the cemetery for the memorial and the foundation services. In the case of a memorial sale by plaintiff (or other non-cemetery monument dealer) the defendant cemetery bills the monument dealer for its foundation work and the dealer in turn includes this charge in its price billed to its customer for the memorial. If the transaction is pre-need, some of the services will obviously be performed at a future date, yet the commitment of the parties insofar as the foundation services are concerned is made at the time of the transaction. The fact that the foundation services or interment services may be deferred and billed through different entities does not destroy the unitary nature of the "product" sold.
12. With respect to plaintiff's tie-in claim against defendants, the Court finds that there was no tie because the sale of a grave space includes interment and foundation services and the transaction does not involve the sale of two separate and distinct products. The defendants do not sell interment services or foundation services outside of their cemetery or apart from their interest in land sold to the buyer. There is no separate market for the sale of installation services apart from the sale of a cemetery lot. Consumers only buy memorials to put them in cemeteries. In order to do that, the buyer must own or contemplate owning an interest in land giving them the right to place a memorial. While plaintiff has attempted to fragmentize the components of the transaction in an effort to show a tie-in, it is clear to this Court that each cemetery sells one bundle of services which are essential to the proper operation of a cemetery and that this single "product" includes a grave space which gives the buyer the right to be buried in that space and the right to have a memorial placed on that space.
13. The cemetery agrees to provide the buyer with an environment which is substantially the same as exists when the grave space is purchased. To assure this, the cemetery agrees to and does provide perpetual care for that grave space and all others in the cemetery. By transferring limited ownership in the land, the cemetery retains the control essential to fulfillment of its obligation to maintain the environment in perpetuity. The interment charges are not an issue, and the foundation charges are divergent and upon the proof submitted appear competitive and reasonable. Comparison of these charges with plaintiff's incredible estimates and promises is meaningless.
14. Defendant cemeteries neither alone nor considered together have any economic dominance to exclude competitors or to control price for grave spaces, the alleged tying product.
15. Defendant cemeteries are non-sectarian and bury persons of all races and all religious beliefs. These cemeteries, therefore, compete with every other cemetery in the market for the sale of grave spaces and full endowed care cemetery service. No one cemetery is a market, and though each cemetery has its own attractive attributes, each sells a package reasonably interchangeable with the others. There do not appear to be any trade barriers, geographic or otherwise, preventing any endowed care cemetery from offering, or any purchaser from accepting, what is in essence a pleasant environment for a final resting place, *529 and a pleasant environment for visiting deceased individuals. There was no sub-market as contended by plaintiff, either in respect to each cemetery being its own relevant geographic market, or with respect to defendants' 22% market share comprising an atheistagnosticno religious affiliation no military affiliation sub-market.
16. There is no interstate commerce involved in the sale of either the claimed tying (grave space) or the tied (foundation service) "product". Neither moves in interstate commerce. All of the defendant cemeteries are located in Missouri and the purchase and use of grave spaces are local transactions. The interment and foundation services involved in use of the lot for burial services are all Missouri transactions. Plaintiff has not shown that the number of memorials coming into the St. Louis market would be any greater or less but for the Rule, nor is there any evidence that the wholesale or retail price of memorials absent the Rule would be any different. The record simply does not admit of a finding that the Rule had some adverse effect on the interstate commerce movement of memorials.
17. The Rule as applied in the defendant cemeteries was and is justified. The basic reason for the Rule is to preserve the necessary control in the cemetery to assure quality memorial installation performed by a labor force sufficiently reactive, responsible and skilled which will not disrupt the cemeteries over-all operation, nor impair or injure the cemetery's ownership interest in the land. The Court finds that foundation work is important and is an inseparable part of the cemetery's responsibility to provide perpetual care. Goodwill, insofar as that term relates to the reputation of a company affecting in a material manner its ongoing operations, is clearly not the only purpose underlying the Rule. The ownership interest of the cemetery and its perpetual maintenance obligation transcend mere goodwill. It is reasonable for the cemetery to require that its employees perform the foundation services including the location and the layout of the foundation site, the scheduling of the foundation work relative to funerals in the cemetery, the actual preparation of a quality foundation, the setting of the markers, the clean-up and the future resetting of a memorial, when necessary.
18. Plaintiff's proposal that it be allowed to prepare foundations for the memorials it sells in each of defendants' cemeteries is not feasible as it involves severely divided accountability and is a burdensome alternative to the practice now employed by defendants. No doubt specifications could be prepared to describe the different foundation procedures of each cemetery. However, based upon all the evidence the Court finds the alternative impractical. Plaintiff seeks to minimize the proper execution of this work and emphasize its own business abilities, at the same time contending that it would do this work without profit and for its own unrealistic estimates of cost. Problems are likely to occur during any third party execution of the work including, inter alia:
(a) each cemetery has its own work crew familiar with the layout and outside operations of the cemetery which maintains the cemetery, prepares and handles interments and prepares foundations for memorials. In seven of the cemeteries outside employees are represented by a labor union. The employees whom plaintiff uses for the delivery of memorials and the setting of memorials and whom it would use to perform foundation work are members of a different union. The court can foresee difficulties particularly in the supervision and control of the men employed by the monument dealers by the men employed by the cemetery.
(b) the cemetery foundation work, which often requires bringing in a cement truck, must be scheduled at a time so as not to coincide with or otherwise disrupt a funeral taking place within the cemetery.
(c) the process of setting memorials is not an exact science. Inevitably some memorials have to be reset. One problem relates to the placement of a memorial on or proximate to a freshly dug grave. The court can readily envision disputes concerning *530 the assignment of fault between the cemetery and monument dealers. As a practical matter, the cemetery remains ultimately responsible to the lot owner if it intends to continue to run a well maintained cemetery.
(d) locating the precise site for the foundation by individuals who are unfamiliar with the particular cemetery's lot shapes, sizes and marking systems.
19. While this plaintiff may comply with the cemetery's requirements as well as the various commitments made by its counsel, other monument dealers may not. The Rule has to be judged in light of the alternative, allowing all monument dealers and even lot owners themselves to perform the work. Implementation of the alternative would place an unreasonable burden on the cemetery.
20. Third party installation would still involve the services of the cemetery in scheduling the work, locating the site, supervising the work and handling the resetting of the memorials, perhaps years after installation. The cemetery would be entitled to be compensated for its services related to this work. Based on the evidence adduced herein the Court finds that in the long run the public would pay more for the services if third party installation was permitted.
21. Five of the defendant cemeteries have a collective bargaining agreement with Local 50 which provides that the employees of those cemeteries have the exclusive right to perform all work in the cemetery which includes preparing foundations. This is but a recognition of the practice of the other cemeteries in the area and there is no evidence that this provision in the contract was inserted to injure plaintiff or any monument dealer or because of the cemetery's memorial sales in competition with them.
22. There was and is no conspiracy by simultaneous agreement or by participation in a plan defendants had knowledge of, between any of the defendants regarding the price for foundation services or the adoption or maintenance of the Rule. In this regard, the Court expressly discredits the testimony of Eugene Rosenbloom. There is no credible evidence that foundation prices were discussed among defendants, and defendants' foundation charges do not disclose any conscious parallelism. Indeed, the evidence discloses a wide divergence of pricing identity and virtual absence of simultaneous price movements while roughly equating to the wage rate increases paid by defendants.
23. Plaintiff was not injured by the Rule. The Court finds that plaintiff's decline of business in certain of defendants' cemeteries was due to the competition with that cemetery or other market factors such as an increase in business by another monument dealer or a decline of business in the cemetery. Plaintiff's reliance on unit sales figures without any reference to market shares in a particular year or the competitive factors at work within the market renders appendix A of plaintiff's post-trial memorandum worthless.
24. Plaintiff was not damaged in any amount capable of ascertainment by this Court. Plaintiff's evidence of damages was wholly speculative.

Conclusions of Law
This Court has personal jurisdiction over the parties herein and has subject matter jurisdiction pursuant to 15 U.S.C. § 15.
Initially the Court notes that plaintiff has apparently abandoned its claims under §§ 2 and 3 of the Sherman Act. Plaintiff has not briefed its monopolization claim and insofar as the Court can determine the reference to § 3 must have been a mistake since § 3 of the Sherman Act outlaws restraints of trade or commerce in any territory or in the District of Columbia. In any event, with respect to plaintiff's monopolization claim, plaintiff has proven none of the elements of monopolization or an attempt or conspiracy to monopolize. There has been no showing of any defendant's individual possession of monopoly power in the St. Louis and St. Louis County market for the sale, manufacture, service *531 and installation of grave markers and memorials nor their collective possession of such power. Furthermore, plaintiff has not shown on the part of any individual defendant nor group of defendants (1) specific intent to monopolize; (2) overt acts; and (3) a dangerous probability of monopolization of the marker or monument market and services connected therewith in the St. Louis and St. Louis County geographic market. See Morning Pioneer, Inc. v. Bismarck Tribune Co., 493 F.2d 383 (8th Cir.), cert. denied 419 U.S. 836, 95 S.Ct. 64, 42 L.Ed.2d 63 (1974). Plaintiff's failure to show any defendant's intent to acquire unlawful monopoly power by means of proscribed conduct is fatal to its claim of conspiracy to monopolize. See American Tobacco Co. v. United States, 147 F.2d 93 (6th Cir. 1944), aff'd 328 U.S. 781, 808-09, 66 S.Ct. 1125, 1138-39, 90 L.Ed. 1575 (1946).
As set forth in finding of fact number 22, no conspiracy to fix prices has been shown.
Similarly, plaintiff has failed to prove a tie-in arrangement in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 or Section 3 of the Clayton Act, 15 U.S.C. § 14. With respect to plaintiff's claim under Section 3 of the Clayton Act, the Court notes that by the manifest terms of the statute even plaintiff's allegations are insufficient to state a claim. Section 3 of the Clayton Act does not cover alleged tying arrangements where the tying or tied product is a service. While it might be argued that defendants supply merchandise in connection with performing the foundation services and such merchandise is a "commodity" within the terms of the Clayton Act, viewing the dominant nature of the transaction it is clear that installation of the foundation is a service and not "goods, wears, merchandise, machinery, supplies or other commodities". See Moore v. Jas. H. Matthews & Co., 550 F.2d 1207, 1214 (9th Cir. 1977); Wendkos v. ABC Consolidated Corp., 379 F.2d 15, 18 (E.D.Pa.1974).
For the purpose of this case a tie-in arrangement may be defined "as an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." Northern Pac. R. Co. v. United States, 356 U.S. 1, 5-6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). The per se illegality under Section 1 of the Sherman Act of a tie-in arrangement is established when plaintiff shows one "that an individual has actually tied two separate and distinct products into a single package ... second, that the individual possesses sufficient economic power in the tying market to appreciably restrain competition; and third, that the arrangement affects a `not insubstantial' amount of interstate commerce." Northern v. McGraw-Edison Co., 542 F.2d 1336, 1345 (8th Cir. 1976).
In the opinion of this Court, defendants sold only one "product"an interest in land in their cemeteries which entitles the buyer to (1) a right of interment in a grave space; (2) a right to place a memorial on the grave space; and (3) perpetual care. That the cemetery may later be paid for performing the service of installing a foundation for a memorial is merely the ancillary method by which "part of the product" is delivered to the buyer. As Judge Aldiserts pointed out in Ungar v. Dunkin' Donuts of America, Inc., 531 F.2d 1211, 1222 (3rd Cir. 1976):
[W]e feel compelled to take a pragmatic and prudential, as well as jurisprudential, view of the problem before us, taking into our perspective both the nature of the ... industry and the effects which may be perceived to flow from the decision under review.
The delivery of foundation services by the cemetery is an ancillary service in connection with making the sale of the cemetery lot. While ancillary, it is also a necessary part of its business if the lot is to be maintained perpetually by the cemetery. Furthermore, this Court cannot ignore the ownership interest of the cemetery. In Missouri, the buyer of a grave space acquires a mere right, privilege or easement of interment, regardless of the form of conveyance, and the cemetery retains fee simple *532 title. Billings v. Paine, 319 S.W.2d 653, 656-57 (Mo.1959). A property owner who sells a limited interest in land which he is to maintain in perpetuity ought to be able to perform services incidental to that sale when they affect its ownership interest and future obligations. For this reason, the condominium analogy is not apposite here. See e. g., Miller v. Granados, 529 F.2d 393 (5th Cir. 1976); Jones v. 247 East Chestnut Properties, 1975-2 Trade Reg.Rep. ¶ 60,491, (N.D.Ill.1974). But see, Moore, supra at 1215. Here, the cemetery owns the predominant interest in the property to be managed and the management and maintenance functions of endowed care cemeteries represent the dominant features of the product that they sell. While condominium owners may be in a position to meet and collectively determine their needs in management of their own property, patrons of full service, managed, regulated and endowed care cemeteries purchase a fixed responsibility for the collective performance of all essential cemetery services by the cemetery itself. Plaintiff understandably decries defendants' focus on business justifications in determining product separability. However, it appears beyond cavil that separability is based not only upon the physical characteristics of the items involved but also on the business justifications for selling the two products in one package. See, 2 Kintner, Federal Antitrust Law, § 10.54, p. 230 (1980).
Normally in a case involving a tie there is a demand for the tied product independent of the tying product. Here there is no separate market for foundation services. Defendants only sell their foundation services incidental to the sale of a grave space in their own cemetery, and while plaintiff desires to perform the service in the defendants' cemeteries, it desires to do so only with respect to its own sale of memorials. The absence of a separate market for foundation services distinct from the sale of cemetery lots or memorials strongly indicates the correctness of defendants' package of rights theory. See Washington Gas Light Co. v. Virginia Electric & Power Co., 438 F.2d 248, 253 (4th Cir. 1971).
The usual tie-in involves an on-going market foreclosure in the tied product. See e. g., Northern Pac. R. Co., v. United States, supra; Miller v. Granados, supra. The sale of cemetery services deriving from the right to have a memorial placed on the grave space, while dependent on exercise of the right, is in fixed proportion to the sale of grave spaces. Recognizing that some latitude is necessarily involved in product definition, Professor Turner has suggested a fixed proportion test:
The sale of items used in fixed proportions might be deemed prima facie the sale of a single product; the combined sale of items used in variable proportions, prima facie a tie-in of different products.
Turner, The Validity of Tying Arrangements Under the Antitrust Laws. 72 Harv. L.Rev. 50, 72 (1958).
Assuming separate products and separate markets plaintiff has also failed to show the second element of a tie-in case, the economic power requirement. It is clear on the evidence submitted that defendants are without sufficient economic power in the grave space market to restrain competition in the market for foundation services. To determine market dominance it is first necessary to establish the relevant market. Initially, plaintiff chose the market of the City and County of St. Louis, Missouri. However, comparing the number of interments by any defendant or the defendants collectively discloses the absence of market dominance. Similarly, plaintiff has not shown uniqueness or land related leverage on the part of any cemetery by which market dominance might be inferred. See United States Steel Corp. v. Fortner Enterprises, (Fortner 2), 429 U.S. 610, 620-22, 97 S.Ct. 861, 867-68, 51 L.Ed.2d 80 (1977). Similarly, since defendants compete not only with each other but with all other cemeteries in the relevant geographical market there is no sub-market as contended by plaintiff. While certain denominational cemeteries may bury a high percentage of their deceased affiliates, the evidence does not even suggest an absence of cross-elasticity of demand. For instance, undisputed *533 testimony indicates that between 10% to 35% of the burials in some of defendants' cemeteries are Catholic. See SmithKline Corp. v. Eli Lilly & Co., 575 F.2d 1056, 1063 (3rd Cir. 1978).
Neither the claimed tying product nor the claimed tied product move in interstate commerce. All of defendants' cemeteries are located in Missouri and the foundation service is clearly a local service performed on lots which are located in Missouri. Plaintiff's argument is that the practice affects the sale of memorials which do move in interstate commerce and that it would have sold more memorials and one or more defendants would have sold fewer, however, there has been no showing that the number of memorials coming into the St. Louis market would be any different absent the Rule. Nor is there any credible evidence that the price of memorials, wholesale or retail, would be any different. See Burke v. Ford, 389 U.S. 320, 321, 88 S.Ct. 443, 444, 19 L.Ed.2d 554 (1967).
Defendants have established that the rule as applied in this case is justified. Justification is a defense in a tie-in case. Ungar v. Dunkin Donuts of America, Inc., supra; Susser v. Carvel, 332 F.2d 505 (2nd Cir. 1964), cert. dismissed 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965). Delegation of performance of foundation services to third party defendants would be a highly burdensome alternative which would not adequately protect defendants' rights and their ability to honor their obligations, and would almost certainly result in raising the price of foundation services to the buyer.
Having found that the Rule is not illegal per se, is justified by legitimate business purposes, is no more restrictive than necessary, and that plaintiff has not shown detrimental market impact, no § 1 violation exists under application of the Rule of Reason analysis. Finally, there is no evidence of an agreement by two or more defendants to perform any unlawful act or to perform a lawful act by unlawful means.
Plaintiff has failed to prove any violation of the antitrust laws by any defendant. Accordingly, judgment will be entered for all defendants against plaintiff.